[No. A122444. First Dist., Div. One. June 3, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
ERIC ARDOIN et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II. of The Appeal of Jaquez.

COUNSEL

Robert Derham, under appointment by the Court of Appeal, for Defendant and Appellant Albert Jaquez.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant Eric Ardoin.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A. Chacon and Frances Marie Dogan, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**DONDERO, J.**—Defendants Eric Ardoin and Albert Jaquez were jointly tried by a jury and convicted of first degree murder (Pen. Code, § 187).[1] They have filed separate appeals. Jaquez argues that the trial court erred by excluding evidence offered by the defense to impeach the primary prosecution witness, and the prosecutor committed misconduct by commenting upon his failure to testify. Ardoin complains that the trial court violated his due process and confrontation rights by giving a revised felony-murder instruction without reopening the case for argument, and denying a motion for mistrial based on admission of evidence of a statement made by his codefendant.

We conclude that the trial court did not abuse its discretion by limiting the defense impeachment of the prosecution witness, and no improper comment on Jaquez's failure to testify occurred. We also conclude that the trial court erred by declining to reopen the case for defense argument after the felony-murder instruction was modified, but the error did not adversely impact the defense argument. Finally, we find no violation of Ardoin's confrontation rights by admission of evidence of a statement made by his codefendant Jaquez. Therefore, the judgments are affirmed.

## STATEMENT OF FACTS

The victim, Rodney Tom, was found dead by San Francisco police officers in an upstairs bedroom of his home at 674 Goettingen Street in San Francisco about 8:00 on the evening of July 10, 2003. He was lying on the floor, with his head near a corner of the room. A long wire ligature was wrapped tightly around his left wrist, and a large pool of blood was visible on the carpet

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

under his head and neck. Additional "cast-off blood" was found near the body on the carpet, low along the wall and on the door. The pattern of the "blood spatter" indicated that the blows or other events "causing the cast off" occurred "very low near the floor or below two feet." Credit cards and other papers were strewn on the bed. Prescription pill vials were observed around the nightstands in the bedroom and in a nightstand drawer. A yellow nylon rope and newspaper were collected from the stairs leading from the entryway to the bedroom. Cash in the amount of $600 was discovered in a gold Mercedes parked in the garage. No drugs were found on the premises. Nor did the officers observe any signs of forced entry into the residence.

Tom sustained "multiple traumatic" sharp force and blunt force injuries, most of them superficial or at least not immediately life threatening, that were inflicted over "many minutes or hours." The primary and ultimately fatal slash wound was to the victim's neck, which severed his carotid artery and produced the "rapid exsanguination" that caused his death. The presence of the ligature restraint and infliction of numerous wounds was "consistent with multiple individuals inflicting these injuries" on the victim, and indicated that he was struggling during the attack. The coroner estimated that Tom had been "dead for a few to several hours, but probably less than a day" before his body was discovered.

Toxicology reports revealed that not long before Tom's death he had ingested valium, methamphetamine, morphine, and cocaine, in amounts that did not cause his death. Tracks of needle marks on his arms and legs were evidence of "skin popping" that indicated habitual ingestion of drugs with the use of a needle. He also suffered from pulmonary emphysema and "poor circulation to the lower extremities" that caused him "difficulty moving around." He was "chronically ill" and in a "weakened state" that impaired his ability to resist an attack.

Fingernail clippings were taken from the victim. "[R]eddish material" discovered on the inside and outside of one of the fingernail clippings tested positive for blood. Expert testimony was received that the genetic material might have been deposited under Tom's fingernail if he scratched the killer with his hands while "resisting the assault." A DNA test of the blood and other "debris" taken from one of the fingernail samples identified defendant Ardoin "as a source of the minor profile."[2]

---

[2] Tom was the source of the major DNA profile of the samples.

The primary witness for the prosecution was Rebecca Burgos, who was the wife of defendant Jaquez when the murder was committed.[3] Burgos admittedly has been a drug addict essentially all of her life, and continued to be a drug addict both when the murder occurred and when she testified at trial. She suffered prior convictions for robbery and assault with a deadly weapon in 1987, and possession of a controlled substance while in custody in 1993.

Burgos testified that she became acquainted with the victim in 2001, and thereafter regularly purchased heroin from him. Tom, in turn, introduced Burgos to Jaquez in February of 2003, and they were married a month later. They began living in the downstairs "in-law apartment" of Tom's residence on Goettingen Street in late February of 2003. Burgos and Jaquez did not pay rent for the apartment. Rather, their agreement with Tom called for them to pay the utilities for the entire residence, "buy food," and do some cooking. Burgos described their ongoing relationship with Tom as "good." She testified that she viewed Tom "like a father" figure.

Tom was a drug dealer who often had "a whole lot of drugs" in his residence. He also kept a .22-caliber revolver inside a sock in his tackle box. Jaquez sold drugs "for himself" and for Tom. Burgos weighed, packaged and sometimes delivered cocaine and heroin. Tom obtained his drugs from a supplier, a Hispanic male, every week or every two weeks. When the supplier was scheduled to appear at Tom's residence, he directed Burgos and Jaquez to "stay downstairs." Tom would then knock on the floor to let them know when the supplier had left.

Burgos became acquainted with defendant Ardoin in 2003. By March of 2003 and thereafter, Burgos saw Ardoin quite frequently, when she and Jaquez visited his residence on Charter Oak Avenue to socialize or bring him drugs for his customers. Burgos testified that Ardoin would typically page Jaquez when he "had customers that wanted to purchase drugs." She and Jaquez would then take the drugs "to his house." They also often used heroin and crack cocaine with Ardoin and his girlfriend Michelle Reese.

By July of 2003, Burgos quit her job as an X-ray technician, and Jaquez worked only infrequently. They used "a lot of drugs" daily, and as a consequence were "broke." They failed to pay the bills for the residence, so in June of 2003 Tom told them to move out by August 1st. As a result, their relationship with Tom became strained and "edgy."

---

[3] Burgos was charged with Jaquez and Ardoin with the murder of Tom. After Jaquez refused to provide her with exculpatory testimony in the case, pursuant to a negotiated disposition Burgos entered a plea of guilty to being an accessory after the fact to the murder (Pen. Code, § 32) in exchange for her testimony against defendants. She received a two-strike sentence of six years for the accessory offense, and a consecutive term of 16 months for a separate offense of possession of drugs while incarcerated in jail.

Burgos was aware that on July 9, 2003, Tom received a large delivery of drugs from his supplier. After the supplier left, Burgos observed the drugs in Tom's tackle box and on the kitchen table. That evening, Jaquez and Burgos visited the home of friends on Palou Avenue to get "high." After "a few more stops" they returned home to the "in-law" unit at Tom's residence. Two to four hours later Jaquez left without telling Burgos where he was going. Later still, Tom called Burgos on the intercom to tell her to "come upstairs" to his bedroom to receive a call from Jaquez. Around 2:00 a.m., Jaquez called and told Burgos that Tom "was going to give [her] something," meaning drugs, "to give to him." Jaquez also asked her to get Tom "something to eat."

Burgos agreed and left the house, only to return a few minutes later because she "forgot to get the drugs" from Tom. She parked her car in the driveway and walked through the open gate to the front door, which atypically was not locked. Burgos saw Ardoin standing in front of their in-law apartment, looking up the stairs toward Tom's residence. Suddenly, Burgos was grabbed from behind in the entryway, thrown to the ground on her stomach, and "hogtied" with her hands bound to her ankles with a rope. She did not see the person who restrained her. Burgos struggled, and heard a voice which she recognized as that of Jaquez tell her to "get down" and "just stay still." After she was restrained, Burgos also saw Ardoin "go up the stairs" with a "Halloween Jason mask" on his face.

From upstairs Burgos heard pounding, banging, scuffling and odd "snapping" noises. She also heard Tom repeatedly say, "I don't have anything." Burgos yelled to Tom: "Rodney, if you have anything, please give it to him, please give it to him." She continued to hear banging, and Tom stated, "There, now go." After Tom yelled, "Here they come," and banged his foot, "it got quiet." Ardoin then came down the stairs with Tom's "tackle box that he kept his drugs in." He stepped over Burgos, walked out of the front door, and left.

Burgos struggled to release her arms from the rope and untie her ankles. She went up the stairs to "check on" Tom in his bedroom. Tom was lying on his stomach with a piece of carpet over his head. Burgos approached Tom and noticed "a slash in his throat" and "a lot" of blood under his head. She "panicked," grabbed Tom's cell phone and ran out of the room. She called Ardoin's number, but his girlfriend Reese said Jaquez "wasn't there."

As Burgos sat on the floor of Tom's residence, Jaquez called. When Burgos answered he asked, "What's up?" Burgos, still in a panicked state, screamed that Tom was dead and Ardoin had killed him. She asked Jaquez to get her out of there, and he agreed to do so. When Jaquez arrived at the house he said, "Come on, let's go," and they proceeded to the in-law apartment.

Burgos was still "freaked out," crying, and continued to yell "Rodney is dead." Jaquez implored Burgos to "calm down." He told her, "I didn't know this was going to happen."

They drove to Ardoin's house, where Burgos noticed Tom's tackle box. Ardoin was "separating the dope" stolen from Tom and dividing it among the three of them. Burgos testified that Jaquez took her share of the drugs. Ardoin suggested that Burgos call the police with a concocted story that she had been robbed. Burgos "didn't know what to do." She was "freaked out" that her friend Tom had been killed and "afraid of going to jail."

After an hour Burgos and Jaquez left Ardoin's house. They decided that they "were going to go to Florida." After a few "drug transactions" they went to a Howard Johnson's hotel early in the morning. Jaquez left the hotel while Burgos slept until the afternoon. She and Jaquez then left the hotel in an old brown car that belonged to a friend, Preston Ely. They discussed a plan to "cover up Rodney's murder" whereby Burgos would be restrained and "thrown in McLaren Park." She would then "get loose" and contact the police with a false report that she had been "robbed" and deposited in the park by the men who "killed Rodney."

Burgos and Jaquez proceeded to a drug store, where Jaquez purchased duct tape. From there, they drove to McLaren Park, where Burgos was placed on her stomach by Jaquez, with her wrists, feet and mouth taped. Jaquez then hid the drugs elsewhere in the park. Burgos fell asleep, and awoke near dark. She loosened the duct tape and hopped to the street. A woman picked her up, the tape was removed from her mouth, and she was taken to a pay phone to call the police.

The police arrived in response to her call and took Burgos to the Ingleside station. She was interviewed, and photographs were taken of her with tape on her wrists. Burgos fabricated a tale that two Black men and a woman had appeared at Tom's house, robbed and killed him "for his drugs," restrained and kidnapped her, then left her in the park. She added false descriptions of the suspects.

Ardoin was arrested for Tom's murder at his brother's residence on May 11, 2004, following the discovery of his DNA in a sample taken from one of the victim's fingernails. On July 11, 2004, both Jaquez and Burgos were arrested pursuant to a warrant served at a residence occupied by Rolley Hill and Christina Matthews at 1087 Palou Avenue in San Francisco. Various narcotics worth a "considerable amount" of money, including heroin, crack cocaine, methamphetamine, and prescription pill bottles that appeared to correspond to those found in Tom's house, along with crack pipes, a scale,

plastic packaging material, and a "methadone card" with "Burgos [*sic*] photo and name on it" were seized from a bedroom in the house. Jaquez and Burgos were subsequently charged with possession of narcotics for sale.

Even after Burgos was arrested for Tom's murder and was confronted with considerable doubt cast upon her account of the crime—in the form of a receipt from the Howard Johnson's hotel when she was supposedly restrained in McLaren Park—she continued to give essentially the same fictitious story during subsequent interviews and in her testimony at a hearing in the present case. Burgos claimed that she repeatedly lied to protect her husband Jaquez and herself, and because she "didn't want to tell on anybody." About six months before trial, Burgos decided to "tell the truth about what happened" after Jaquez repeatedly lied to her and refused to come forward and "say what they did" to protect her. She also received a threatening letter from Jaquez while she was incarcerated in county jail. Burgos denied that she assisted in any way with the killing of Tom by Ardoin and Jaquez. She acknowledged that her plea bargain, in which she agreed to plead guilty to being an accessory after the fact, was an appropriate disposition for her actions.

The prosecution presented additional evidence in an effort to indirectly corroborate Burgos's testimony. Jia Zhang, a Luxor taxicab driver testified that he picked up two Hispanic men in their "mid-40's" on Charter Oak Avenue, near the 101 Freeway, at 4:31 a.m. Three minutes later he dropped them off at the intersection of Dwight Street and Girard Street, two short blocks from Goettingen Street. In August of 2003, the police exhibited a photo lineup to Zhang. He made a "50/50" identification of Ardoin's photo as one of the men in his cab that morning. Zhang was not able to make an identification of Jaquez in another photo lineup.

Maritza Santiago, the mother of Jaquez's two sons, testified that she was "romantically involved" with Jaquez in the early 1990's. In July of 2003, Jaquez continued to visit her house at 391 Bridgeview Drive in San Francisco regularly to "see his kids." Jaquez appeared at her house two or three days before Tom was killed. He was "broke," hungry, and appeared "stressed out." Jaquez told Santiago that "it was a big mistake" for him to be involved with Burgos.

Jaquez's son Eric testified that on July 9, 2003,[4] Jaquez appeared at the house on Bridgeview Drive about 8:00 p.m. During the course of their conversation, Eric asked if Jaquez had "a couple of dollars," but Jaquez said "he didn't have it." In response to Jaquez's request Eric loaned him a cell phone.

---

[4] To avoid confusion we will refer to defendant Jaquez by his last name and his son Eric by his first name.

Eric's cousin, Juan Henry Pena, also lived in Santiago's Bridgeview Drive residence in July of 2003. Pena testified that on the afternoon of July 9, 2003, Jaquez came by the house to borrow his cell phone. Pena met Jaquez in Silver Terrace Park the next afternoon; Jaquez seemed "nervous." He returned the cell phone to Pena, along with a pager. Jaquez told Pena that "he went home . . . looking for his wife and that when he got there, the house was a mess." He saw Tom "on the floor with a bunch of blood around him," and he "didn't know what to do." Later the same afternoon, Pena gave Jaquez a ride. They drove past Tom's house at 674 Goettingen Street where Jaquez lived with Burgos. Police cars were parked outside the house. Pena drove Jaquez to the Franciscan Motel on Third Street.

Preston Ely, known to his friends as "Stevie," was acquainted with defendants and saw both of them frequently in July of 2003, usually about "drugs." Ely often lived in his half-ton van that he parked "off of Third Street," near Jamestown Avenue, in the Bayview District. Ely acknowledged that he used and sold drugs. Ely testified that between 10:00 and 11:00 on the morning of July 10, 2003, Jaquez, whom he knew as "Beto," arrived unexpectedly and asked to "trade cars." Ely agreed, and exchanged his brown Ford Granada for Jaquez's Mitsubishi van. Ely also agreed to loan Jaquez his cell phone in exchange for speed and crack cocaine.

Later that evening Jaquez visited Ely in his room at the Franciscan Motel on Third Street. Jaquez complained that Ely's Ford Granada "ran out of gas" in McLaren Park, and Jaquez left it there. Jaquez told Ely that he had seen his landlord, a "Chinese dude" who lived upstairs from him, "lying there with his throat cut." Jaquez stated that he was "having problems getting drugs" from Tom, and was "being put out" of his residence for failing to pay rent. Jaquez received phone calls while he was at Ely's motel room. He became "very upset," and "started crying." In reference to the "Chinese dude getting killed," Jaquez told Ely, "I didn't do it, it wasn't me. It wasn't supposed to happen." Jaquez also mentioned that he had placed duct tape on a woman in McLaren Park and "that he was going to call the police" to "come get her and use that as an alibi."

After their conversation in the motel room, Jaquez and Ely drove to McLaren Park in the Mitsubishi to "find the drugs" Jaquez and Burgos had previously concealed there. Jaquez left the car to search in the park, but did not return with anything. They drove back to the Franciscan Motel. On the way they fortuitously encountered Burgos on the street, and she joined them. Later still, the three of them returned to the same place in the park, where Burgos promptly found the hidden drugs. They went back to the motel room and ingested drugs before Jaquez and Burgos left. Ely testified that in the motel room Burgos was "hollering" and "bossing around" people, particularly Jaquez.

Ely further testified that about eight months before trial he received a call from Jaquez, who told him to "stay out of it, he got the case beat, to stay out of it." Jaquez sounded "serious," and Ely felt "threatened." Ely entered the witness protection program in December of 2006. He was relocated by the prosecution, and received both a "living place" and expenses from the State of California.

The prosecution also presented evidence of records of calls made with the telephones owned, borrowed, or used by defendants on or near the date of the murder. The records revealed numerous calls between them on July 10, 2003.

Ardoin testified in his defense at trial that he and Jaquez were "very close" friends for many years. He met Burgos just after she married Jaquez in 2003. Ardoin considered Burgos to be aggressive, pushy, manipulative, and not entirely honest.

Ardoin acknowledged that he was a drug addict, who not only used cocaine, crack, heroin and methamphetamine regularly, but also sold drugs "every day." He and Jaquez often used drugs together. Ardoin was also acquainted with Tom as a supplier of heroin, who dealt larger amounts of drugs than he did. Ardoin bought drugs from Tom occasionally.

According to Ardoin, Tom visited Ardoin's residence on Charter Oak Avenue the afternoon before Tom was killed. Tom brought with him a half-ounce of "new heroin." Ardoin sought to explain the DNA evidence by testifying that Tom injected him with heroin, and in the process drops of blood ran down his arm. After testing the heroin and determining that it "was good," Ardoin bought a quarter-ounce from Tom.

About 4:00 a.m. on July 10, 2003, Jaquez called to tell Ardoin that "he was coming over" to his house. They intended to "buy some coke together." While Ardoin and Tom were in the shed, Burgos called, "hollering and screaming" that she "needed to talk to her husband." After a brief telephone conversation with Burgos, Jaquez's expression changed "in a bad way." He was anxious and angry. Jaquez asked Ardoin to accompany him to his house. Ardoin agreed, although he expressed that he was "walking with a cane" at the time and could not offer much assistance.

Jaquez and Ardoin took a cab to a residence near Brussels Street and Dwight Street. Jaquez "went up the stairs to the house" while Ardoin waited on the street. Within 30 seconds Jaquez returned and told Ardoin to "hurry up" and follow him up the hill to Tom's house on Goettingen Street. As Ardoin reached Jaquez's green Mitsubishi, he noticed Jaquez coming out of a gate into the house, followed by Burgos. Burgos was disheveled, with her

hair "messed up," and was carrying a tackle box by the handle. She was "hollering and screaming" at Jaquez, who was carrying a plastic garbage bag with something inside it.

They all got in the Mitsubishi to drive to Ardoin's house. Ardoin asked, "What's happening?" Burgos yelled at him, "Rodney's dead." Jaquez then "slammed on the brake" and looked at Burgos in "shock." When they reached Ardoin's house, Burgos said "something" to Ardoin with an "angry and wild" look which he took as a threat. Ardoin testified that he did not see Jaquez again until "2004 in court," although he spoke to him on the telephone a week or so after the murder. They did not "talk about what happened." Ardoin helped Burgos move her belongings out of the Goettingen Street residence "a couple of days later," and continued to take drugs and socialize with her.

Ardoin denied that he went into Tom's house the day of the murder or assisted anyone with the robbery and murder of Tom. He conceded that he lied in interviews with the police, to protect Jaquez and Burgos. Ardoin also agreed that the presence of his DNA under the victim's fingernails was "important in this case," and he had "no idea how that happened." Ardoin speculated that blood reached the victim's fingernails during the intravenous injection of heroin the day before the murder.

Ardoin presented evidence that his back was injured and he walked with a cane in July of 2003 as a result of back surgery in December of 2002. In addition, he had severe pain in both shoulders. He was taking methadone, Vicodin, codeine, and "a lot of other medications" for pain at that time. He had trouble walking, bending, twisting or squatting. Ardoin's medical records and testimony from his physicians and a health worker for the San Francisco Department of Public Health corroborated his testimony that he suffered from shoulder, back and leg maladies, which severely compromised his balance, mobility and strength. Medical records indicated that Ardoin walked with a cane and took medication for his chronic pain. Ardoin's physicians posited that if he was truthful in reporting his symptoms and injuries to them, he would have been capable only with great "difficulty" of carrying any heavy items, overcoming a resisting victim, or stabbing a victim multiple times by himself during an attack.

# DISCUSSION

*The Appeal of Jaquez*

I. *The Exclusion of Proffered Defense Evidence to Impeach Burgos.*
 *(Joined by Ardoin.)*

Defendants argue that the trial court erred by excluding evidence offered by the defense to impeach Burgos. Prior to trial Jaquez moved to present as impeachment evidence of prior acts by Burgos that reflected on her "dishonesty and tendencies towards acts of violence and moral turpitude," which included the circumstances of her 1988 convictions for robbery and assault with a deadly weapon: That Burgos approached the victim, solicited for an act of prostitution, and directed him to drive his vehicle to a "dead end," where she produced a handgun and ordered him to give her his wallet, money, and keys; as Burgos's codefendant, Payne, approached the rear of the vehicle, her attention was diverted momentarily, whereupon the victim grabbed the gun, which fired a shot through the driver's side window; after Payne then stabbed the victim several times in the neck and chest, he and Burgos both "fled the scene."[5] Burgos entered a guilty plea to charges of robbery and assault with a deadly weapon after a charge of attempted murder was dismissed. She offered a different version of the incident in her statement to the police, in which she denied that Payne had any "involvement" in the crimes, although she did not testify on behalf of Payne at his trial, and made "statements to the judge inculpating" Payne during an in-chambers hearing on a motion for acquittal of the attempted murder charge under section 1118.1.[6]

At a hearing on the motion the defense also asked to offer evidence that while Burgos was incarcerated awaiting trial in the present case she attempted through her boyfriend Dennis Torres and her attorney to have drugs delivered to her in county jail. The effort was unsuccessful and did not result in charges, but Burgos was subsequently convicted for possession of heroin in jail based on a separate incident. Jaquez argued that the evidence was admissible under Evidence Code section 788 to demonstrate Burgos's "moral depravity," dishonesty, manipulation of others, and propensity to acts of violence.

The trial court granted the motion to impeach Burgos with evidence of the fact of her 1988 robbery and assault with a deadly weapon convictions, and with the 2006 conviction for possession of drugs in San Francisco County Jail, but excluded evidence of the particular circumstances of the offenses and

---

[5] The facts of the convictions were taken from the probation report in the case.

[6] Payne was ultimately convicted of attempted murder.

her statements related to the offenses. The "conduct concerning conspiracy to smuggle drugs in San Francisco County Jail" through Burgos's boyfriend and attorney was also excluded.

Defendants assert that the excluded impeachment evidence proved Burgos "was a violent criminal who manipulated the judicial system when it suited her purpose," and thus "was material to the defense theory that Burgos was not, as she claimed, an accessory after the fact to the Tom homicide, but an active participant in the crime, if not the sole perpetrator of it." Defendants maintain that the evidence of "Burgos's true character" was more relevant to the defense than the mere fact of the prior convictions, and was necessary evidence to show that she "was not simply a dishonest drug addict," but rather a person who lied, "manipulated others to her advantage" and was capable of acts of violence. They claim that "exclusion of evidence this relevant" to the credibility of the prosecution's main witness violated their "rights to confrontation, to present a defense, and to due process" under the California and United States Constitutions.

■ We begin our analysis with recognition of the fundamental constitutional premise that, " '[T]he right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, . . . to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law.' [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 538 [3 Cal.Rptr.3d 145, 73 P.3d 1137].) "The constitutional right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility." (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 841–842 [74 Cal.Rptr.3d 416].) "As the high court · has explained, cross-examination is required in order 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' [Citation.]" (*People v. Smith* (2007) 40 Cal.4th 483, 513 [54 Cal.Rptr.3d 245, 150 P.3d 1224].)

" '[But i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.' [Citation.]" (*People v. Ayala* (2000) 23 Cal.4th 225, 269 [96 Cal.Rptr.2d 682, 1 P.3d 3].) "[N]ot every restriction on a defendant's cross-examination rises to a constitutional violation." (*People v. Singleton* (2010) 182 Cal.App.4th 1, 18 [105 Cal.Rptr.3d 628].) The "right of confrontation is not absolute, however [citations], 'and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' [Citation.]" (*Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1138–1139 [99 Cal.Rptr.2d 149, 5 P.3d 203]; see also *Taylor v. Illinois* (1988) 484 U.S. 400,

410 [98 L.Ed.2d 798, 108 S.Ct. 646]; *People v. Brown, supra,* 31 Cal.4th 518, 538; *People v. Jackson* (1993) 15 Cal.App.4th 1197, 1203 [19 Cal.Rptr.2d 80].)

" '[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' [Citations.] Exclusion of impeaching evidence on collateral matters which has only slight probative value on the issue of veracity does not infringe on the defendant's right of confrontation." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 350 [68 Cal.Rptr.2d 61]; see also *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679 [89 L.Ed.2d 674, 106 S.Ct. 1431]; *People v. Cooper* (1991) 53 Cal.3d 771, 817 [281 Cal.Rptr. 90, 809 P.2d 865].) Ordinarily, proper application of the statutory rules of evidence does not impermissibly infringe upon a defendant's due process rights. (See *People v. Lucas* (1995) 12 Cal.4th 415, 464 [48 Cal.Rptr.2d 525, 907 P.2d 373]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103 [31 Cal.Rptr.2d 321, 875 P.2d 36].)

■ "In particular, notwithstanding the confrontation clause, a trial court may restrict cross-examination of an adverse witness on the grounds stated in Evidence Code section 352." (*People v. Quartermain* (1997) 16 Cal.4th 600, 623 [66 Cal.Rptr.2d 609, 941 P.2d 788].) " '[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. [Citation.]' [Citations.] The confrontation clause allows 'trial judges . . . wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' [Citation.] In other words, a trial court may restrict cross-examination on the basis of the well-established principles of Evidence Code section 352, i.e., probative value versus undue prejudice. [Citation.] There is no Sixth Amendment violation at all unless the prohibited cross-examination might reasonably have produced a significantly different impression of credibility." (*People v. King* (2010) 183 Cal.App.4th 1281, 1314–1315 [108 Cal.Rptr.3d 333], fn. omitted; see also *People v. Hillhouse* (2002) 27 Cal.4th 469, 494 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *People v. Brown, supra,* 31 Cal.4th 518, 545–546.)

Defendants submit that the trial court erred by finding the circumstances of Burgos's prior convictions were "categorically barred" from admission under the rule articulated in *People v. Heckathorne* (1988) 202 Cal.App.3d 458, 462 [248 Cal.Rptr. 399] (*Heckathorne*), before the enactment of the "Truth-in-Evidence" amendment to the California Constitution (Cal. Const., art. I, § 28,

subd. (f)(2)), which provides that "relevant evidence shall not be excluded in any criminal proceeding . . . ," and supersedes all statutory prohibitions on the admission of relevant evidence, except those preserved by article I, section 28, subdivision (f), of the Constitution itself. (*People v. Wheeler* (1992) 4 Cal.4th 284, 291–292 [14 Cal.Rptr.2d 418, 841 P.2d 938] (*Wheeler*).) The rationale for the rule confining the nature and extent of impeachment with prior convictions to the name, type, date, and place of conviction is that a witness may not be impeached on the basis of specific instances of conduct tending to show a trait of the witness's character. (Evid. Code, §§ 786, 787, 788; *People v. Allen* (1986) 42 Cal.3d 1222, 1270 [232 Cal.Rptr. 849, 729 P.2d 115].) Defendants insist that "*Heckathorne* is no longer good law after *Wheeler*," in light of the removal by the Truth-in-Evidence amendment of most statutory limitations on the admission of relevant evidence other than Evidence Code section 352.

Both before and after the Truth-in-Evidence amendment became law in 1982, the established rule has remained in effect that the facts and circumstances underlying prior offenses are inadmissible for impeachment purposes, unless the witness has first attempted to mislead the jury or minimize the facts of the prior offense. (See *People v. McClellan* (1969) 71 Cal.2d 793, 809 [80 Cal.Rptr. 31, 457 P.2d 871]; *People v. Szadziewicz, supra,* 161 Cal.App.4th 823, 842; *People v. Lepolo* (1997) 55 Cal.App.4th 85, 89 [63 Cal.Rptr.2d 735].) In *People v. Smith* (2003) 30 Cal.4th 581, 633 [134 Cal.Rptr.2d 1, 68 P.3d 302] (*Smith*), the California Supreme Court recognized the rule that "impeachment does not extend to the facts underlying the convictions," and declined to "decide whether this rule still applies" following the decision in *Wheeler* because "the district attorney questioned the witnesses only about the convictions themselves, not the underlying facts." (Citing *Heckathorne, supra,* 202 Cal.App.3d 458, 462.)[7]

As in *Smith*, we need not examine the continued validity of the *Heckathorne* decision and those that have followed it. In the present case the trial court did not categorically exclude evidence of the details and circumstances surrounding Burgos's prior convictions. Rather, the court properly recognized and engaged in the requisite Evidence Code section 352 analysis before limiting the admission of the impeachment evidence. "Although *Wheeler, supra,* 4 Cal.4th 284, allows for impeaching a witness in a criminal case with evidence of moral turpitude, it cautions that trial courts should consider with 'particular care' whether to allow such evidence." (*People v. Sapp* (2003) 31 Cal.4th 240, 289–290 [2 Cal.Rptr.3d 554, 73 P.3d 433].)

---

[7] We are also aware that, " 'Past criminal conduct involving moral turpitude that has some logical bearing on the veracity of a witness in a criminal proceeding is admissible to impeach . . .' a witness." (*People v. Cadogan* (2009) 173 Cal.App.4th 1502, 1514 [93 Cal.Rptr.3d 881].)

Article I, section 28, subdivision (d), of the California Constitution " 'does preserve the trial court's discretion to exclude evidence whose probative value is substantially outweighed by its potential for prejudice, confusion, or undue consumption of time. [Citation.]' [Citation.] 'The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues . . . . [¶] . . . Moreover, impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value.' [Citation.]" (*Sapp, supra,* at p. 289, quoting *Wheeler, supra,* 4 Cal.4th 284, 295, 296–297.)

The decision on "[t]he admission of past misconduct involving moral turpitude to impeach a witness in a criminal trial is subject to the trial court's discretion under Evidence Code section 352. [Citation.] On appeal, the trial court's decision is reviewed for abuse of discretion. [Citations.] To constitute an abuse of discretion, 'the resulting injury [must be] sufficiently grave to manifest a miscarriage of justice. [Citation.] In other words, . . . the court [must] exceed[] the bounds of reason, all of the circumstances being considered.' [Citation.] In most instances the appellate courts will uphold the exercise of discretion even if another court might have ruled otherwise." (*People v. Feaster* (2002) 102 Cal.App.4th 1084, 1091–1092 [125 Cal.Rptr.2d 896]; see also *People v. Funes* (1994) 23 Cal.App.4th 1506, 1519 [28 Cal.Rptr.2d 758].) " 'The weighing process under section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon mechanically automatic rules. . . .' [Citation.]" (*People v. Greenberger, supra,* 58 Cal.App.4th 298, 352.) "The determination whether a defendant has been denied the right of confrontation is focused on the individual witness." (*Id.* at p. 350.)

While we do not discount the probative value of evidence that Burgos engaged in violent acts, manipulation, and deceit, we conclude that under the circumstances presented here the trial court at least acted within its discretion in precluding further defense cross-examination. First and foremost, the defense had both the opportunity and the evidentiary substance to thoroughly challenge Burgos's credibility without the excluded evidence. Not only did the fact of the prior convictions and her admitted use of a firearm during the robbery and assault offenses adequately indicate her violent nature and moral indigence, but her character and testimony were thoroughly challenged with withering and successful attacks on many other levels. She was effectively portrayed as an inveterate drug addict who admittedly sold drugs and "went to great lengths" to have others bring drugs to her in jail. She admitted and the prosecutor conceded that she lied incessantly to the police and to others to further her perceived interests. Testimony was received from others that

Burgos was manipulative, controlling, and subject to unruly outbursts. Burgos admitted as much. During closing argument defense counsel stressed her dishonesty, repeated and elaborate fabrications, and palpable moral deficiencies. Further, the extent to which the jury accepted Burgos's testimony was clearly not attributable to the inability of the defense to attack her character or inherent lack of credibility—which effectively occurred—but rather to the corroboration of her version of the murder, particularly by the DNA evidence and Ely's consistent testimony. Thus, while the excluded impeachment evidence may have augmented the showing that Burgos lacked credibility, it was cumulative, and, in our view, would not have produced a perceptibly different impression of her credibility. (See *People v. Singleton, supra*, 182 Cal.App.4th 1, 18–19.)

■ Cross-examination is subject to restriction under Evidence Code section 352 if it is cumulative or if it constitutes impeachment on collateral issues. (*People v. Mincey* (1992) 2 Cal.4th 408, 439–440 [6 Cal.Rptr.2d 822, 827 P.2d 388]; *People v. Morse* (1992) 2 Cal.App.4th 620, 641–642 [3 Cal.Rptr.2d 343].) The trial court's wide discretion under Evidence Code section 352 to limit cross-examination is not abused by the exclusion of impeachment evidence which has only marginal probative value. (*Wheeler, supra*, 4 Cal.4th 284, 295–296; *People v. Dyer* (1988) 45 Cal.3d 26, 48 [246 Cal.Rptr. 209, 753 P.2d 1]; *People v. Bento* (1998) 65 Cal.App.4th 179, 195 [76 Cal.Rptr.2d 412].) "Moreover, reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination." (*People v. Brown, supra*, 31 Cal.4th 518, 545.)

We do not suggest that the probative value of the excluded collateral acts evidence was inconsequential, but we agree with the trial court that it was outweighed by the confusion of issues and considerable amount of time required to present it. (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 363 [100 Cal.Rptr.3d 339].) Candidly, the defense had already spent itself on what can be characterized as an assaultive cross-examination of Burgos. Had the evidence been admitted, the trial would have digressed into a lengthy dispute over the collateral matters related to the facts of Burgos's 1988 convictions, the truthfulness of her statements in that criminal proceeding, and her attempt to use her boyfriend and unwitting attorney to obtain drugs in jail. " '[T]he latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' [Citation.]" (*People v. Smith, supra*, 40 Cal.4th 483, 512–513.) " '[T]he discretion to be exercised is that of the trial court, not that of the reviewing court,' " and even if we may have ruled otherwise in the first instance we cannot reverse a decision that is supported by the record.

(*Tuggles, supra,* at p. 361.) We discern no abuse of the trial court's discretion in the evidentiary ruling and no violation of defendants' rights to confront and cross-examine Burgos at trial. (*People v. Brown, supra,* 31 Cal.4th 518, 545–546; *People v. Sapp, supra,* 31 Cal.4th 240, 289–290.)

II. *The Prosecutor's References to Jaquez's Failure to Present Evidence*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*The Appeal of Ardoin*

I. *The Felony-murder Instructions Given During Jury Deliberations.*

Ardoin objects to the trial court's delivery during deliberations of revised instructions that "informed the jury for the first time" of a "new theory of liability" under the felony-murder rule. Ardoin complains that his "due process right to a fair trial" and his right to "effective assistance of counsel" were denied by the felony-murder instructions that essentially introduced a novel and distinct basis for his conviction after closing argument.

Ardoin's contention requires that we engage in a recitation in some detail of the rather convoluted procedural history of the case that culminated in the challenged felony-murder instructions. Ardoin was charged with first degree murder with malice aforethought as the direct perpetrator of the murder of Tom, and the case against him proceeded on that theory at trial. Codefendant Jaquez, in contrast, was charged with and prosecuted under aiding-and-abetting and felony-murder theories.

Nevertheless the evidence presented at trial was also susceptible to interpretations that both defendants directly and conjointly participated in the robbery and murder of the victim, or that either of them may have perpetrated the robbery and aided and abetted the other to commit the murder. During closing argument, the prosecutor thoroughly discussed the felony-murder and aiding-and-abetting theories, with reference to Jaquez, but also without delineation of which of the two codefendants was guilty under those theories. Ardoin was characterized by the prosecutor as the "perpetrator" or the "lead in this killing."

Defense counsel emphasized during closing argument that Ardoin did not have the "physical capacity" to restrain and assault the victim. Counsel suggested that in light of Ardoin's documented physical infirmities the prosecution had been forced to "abandon" the theory that he personally

---

[*]See footnote, *ante,* page 102.

"subdued and killed" Tom in favor of a "speculative theory" that he "wasn't necessarily the killer," but instead "somehow helped" with the murder. Counsel mentioned "two scenarios" presented by the prosecution in the case: one that indicated Ardoin was "a killer," and the other that sought to convict him as an "aider or abettor and not actually the killer." Counsel also argued that the prosecutor "changed the theory" of murder against Ardoin to "aiding and abetting." Then, defense counsel proceeded to engage in argument, with references to the evidence, that the prosecution failed to prove the "new aiding-and-abetting theory" that was "based only on speculation" and was contrary to the testimony of prime prosecution witness Burgos. Therefore, defense counsel presented these alternative theories in his attack on the strength of the prosecution's case against Ardoin.

During rebuttal argument the prosecutor underscored that both codefendants, and perhaps Burgos as well, had a "role" in Tom's death. The prosecutor advised the jurors to find that if defendants pursued a "concerted action" to murder Tom, they could both be found guilty under either the felony-murder rule or as direct perpetrators of the offense. Review of the transcripts convinces us that counsel for the prosecution and Ardoin posited the legal theories of murder (premeditation and felony murder) in their arguments.

Following argument, the felony-murder and aiding-and-abetting instructions (CALCRIM Nos. 540B & 401) agreed upon by the parties and given to the jury referred only to Jaquez. However, all counsel were aware of, and had settled on, the jury instructions before final argument began. The court also instructed the jury that each charge against each defendant must be considered separately, and: "Unless I tell you otherwise or unless it's stated in the instructions, all instructions apply to each defendant."

During deliberations, the jury asked in a note given to the court: "If we believe that Eric Ardoin was not the perpetrator of the murder, can we still find him guilty under a theory of felony murder, or otherwise?" The prosecutor suggested that the court either reply in the affirmative, with reference to CALCRIM No. 540B, or further instruct the jury in some form that the principles of CALCRIM No. 540B "are applicable to . . . any charged defendant" in the case. Defense counsel objected on several grounds: first, that the prosecution proceeded on the theory that Ardoin was "the direct perpetrator," and the evidence did not support a felony-murder theory against him; second, that closing argument on behalf of Ardoin was based on the concept that the felony-murder theory did not include him; and third, that to "essentially change the instructions" to include Ardoin in the felony-murder theory "would be prejudicial" to him since the defense "did not argue the issue." The defense recommended that the court merely refer "the jury to all the instructions in their entirety as to what legal bases they can use" to find Ardoin "either guilty or not guilty."

The trial court noted that the reference to Jaquez alone in the CALCRIM No. 540B instruction was some form of computer "program" error that failed to include both defendants. The court proposed to clarify CALCRIM No. 540B by advising the jury that the instruction "is applicable to any charged defendant." Defense counsel continued to object to "applying the felony-murder theory now" to Ardoin, based on the lack of substantial evidence to support it, and the "lateness of the application of the theory of liability to him after closing argument." The trial court decided to further instruct the jurors that they "may only find the defendant guilty under the instructions provided," and that the "felony-murder instruction may apply to either defendant if the jury finds that each of the elements has been proven." Regrettably, the original trial court judge left on vacation before responding to the jury.

At the next court session, Ardoin's counsel moved for a mistrial or to reopen argument, while the jury reaffirmed the need for guidance on the issue of the felony-murder rule as applied to Ardoin. After reviewing the previously given instructions and particularly the closing arguments given by defense counsel, the substitute trial judge observed that defense counsel referred on "numerous occasions" to aiding and abetting as a "new theory" in the case. Despite counsel's protest that his aiding-and-abetting closing argument was "in passing," and would have been more thorough, particularly as to the "intent element" of aiding and abetting, the "specifics" of the evidence of encouraging or promoting the crime, and the natural and probable consequences aspect of the felony-murder rule, the defense motion for mistrial or to reopen argument was denied.

A "new and revised" CALCRIM No. 540B instruction was given to the jury that, the court explained, "replaces the instruction that was given to you originally." Instead of referring only to *Jaquez*, the instruction stated: "The defendants are charged with murder. *All defendants may be guilty of murder under a theory of felony murder*, even if another person did the act that resulted in the death." (Italics added.)[8] The court then proceeded to repeat the elements of felony murder previously stated in the CALCRIM No. 540B instruction.

Ardoin argues that the trial court deprived him of the rights to effective assistance of counsel and due process by instructing the jury "on a new theory of liability after the start of deliberations" without granting his request to "reopen argument to address" the felony-murder theory. Ardoin claims that

---

[8] The original instruction read: "Now, the defendant *Albert Jaquez* is charged with murder under the theory of felony murder. The defendant *Albert Jaquez* may be guilty of murder under the theory of felony murder, even if another person did the act that resulted in the death." (Italics added.)

he "was not informed of the new theory of non-killer felony murder until *after* closing argument and during jury deliberations." Therefore, his argument continues, his right to counsel was abridged "because 'that right is . . . meaningless unless counsel knows and has a satisfactory opportunity to respond to the charges against which he or she must defend.' " (See *Sheppard v. Rees* (9th Cir. 1989) 909 F.2d 1234, 1237 (*Sheppard*).)

We begin our analysis with the observation that despite the failure of the prosecution to specifically charge Ardoin with murder committed in the course of an enumerated felony in violation of section 189, he was not denied his notice or due process rights when the trial court gave felony-murder and aiding-and-abetting instructions to the jury.[9] The California Supreme Court has repeatedly and definitively declared that felony murder (§ 189) and premeditated murder (§ 187) are not separate crimes, but rather different varieties of the same crime, so a defendant may be convicted of felony murder even though the information charged only murder with malice. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 140–141 [112 Cal.Rptr.3d 746, 235 P.3d 62]; *People v. Hawthorne* (2009) 46 Cal.4th 67, 89 [92 Cal.Rptr.3d 330, 205 P.3d 245]; *People v. Morgan* (2007) 42 Cal.4th 593, 617 [67 Cal.Rptr.3d 753, 170 P.3d 129].) "[A]lthough the two forms of murder have different elements, only a single statutory offense of murder exists. Felony murder and premeditated murder are not distinct crimes, and need not be separately pleaded." (*People v. Nakahara* (2003) 30 Cal.4th 705, 712 [134 Cal.Rptr.2d 223, 68 P.3d 1190].) From the murder charge and the evidence adduced at the preliminary hearing and at trial Ardoin received constitutionally adequate notice of the necessity to defend against a felony-murder theory of liability. (*People v. Moore* (2011) 51 Cal.4th 386, 413 [121 Cal.Rptr.3d 280, 247 P.3d 515]; *Letner, supra*, at p. 141.) Thus, the trial court correctly instructed on felony murder, and the jury, in returning a general verdict for first degree murder, did not improperly convict Ardoin of an uncharged offense. (*Hawthorne, supra*, at p. 89; *Morgan, supra*, at p. 617.)

Further, the jury was not required to agree unanimously whether defendant was the actual perpetrator of the murder or the other participant in the crime. (*People v. Alexander* (2010) 49 Cal.4th 846, 921 [113 Cal.Rptr.3d 190, 235 P.3d 873]; *People v. Majors* (1998) 18 Cal.4th 385, 408 [75 Cal.Rptr.2d 684, 956 P.2d 1137]; *People v. Guerra* (1985) 40 Cal.3d 377, 386 [220 Cal.Rptr. 374, 708 P.2d 1252].) "It is settled that as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty. [Citations.] More specifically, the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the

---

[9] Ardoin, along with Jaquez and Burgos, were charged with murder with malice aforethought in violation of section 187.

direct perpetrator." (*People v. Santamaria* (1994) 8 Cal.4th 903, 918 [35 Cal.Rptr.2d 624, 884 P.2d 81].) The instructions were supported by the evidence, and nothing in the record indicates that the jury was confused by the instructions. (*Alexander, supra,* at p. 921.) Viewed in the abstract, the felony-murder instructions did not violate Ardoin's federal constitutional rights to due process, notice, proof beyond a reasonable doubt, or a unanimous verdict. (*People v. Carey* (2007) 41 Cal.4th 109, 131–132 [59 Cal.Rptr.3d 172, 158 P.3d 743].)

██ The more difficult issue arises from the unfortunate chronology of events in the present case, which resulted in the felony-murder instructions explicitly related to Ardoin being given to the jury after closing argument. The trial court did not lack the authority to give the modified version of the CALCRIM No. 540B instruction during jury deliberations, particularly upon learning of the jury's expression of confusion about the felony-murder rule as applied to Ardoin. "With regard to the timing of jury instructions on the law, . . . trial courts are vested with wide discretion as to when to instruct the jury. (§§ 1093, subd. (f), 1094; *People v. Chung* (1997) 57 Cal.App.4th 755, 758 [67 Cal.Rptr.2d 337] . . . .)" (*People v. Smith* (2008) 168 Cal.App.4th 7, 14 [85 Cal.Rptr.3d 180].) Section 1093.5 provides that in a criminal case the court must decide upon and inform counsel of "all instructions to be given" before the "commencement of argument," but adds that "if, during the argument, issues are raised which have not been covered by instructions given or refused, the court may, on request of counsel, give additional instructions on the subject matter thereof." "[S]ection 1093 sets out the general order in which a trial should proceed, specifically providing in subdivision (f) that at the conclusion of the evidence and after the closing arguments of counsel, the court may charge the jury and give them a written copy of the instructions read. Subdivision (f), however, also provides that 'At the beginning of the trial or from time to time during the trial, and without any request from either party, the trial judge may give the jury such instructions on the law applicable to the case as the judge may deem necessary for their guidance on hearing the case.' Under section 1094, the court may depart from the usual order of trial set forth in section 1093 'for good reasons, and in the sound discretion of the Court.' (§ 1094.)" (*People v. Smith, supra,* at p. 15; see also *People v. Hill* (1992) 6 Cal.App.4th 33, 47–48 [8 Cal.Rptr.2d 123].) " 'No error results from granting a request to reopen in the absence of a showing of abuse. [Citation.]' [Citation.]" (*People v. Riley* (2010) 185 Cal.App.4th 754, 764 [110 Cal.Rptr.3d 585].)

██ Under the circumstances the trial court did not abuse its discretion by giving a supplemental instruction on felony murder following closing argument. (See *People v. Chung, supra,* 57 Cal.App.4th 755, 758–760.) When presented with the jury's inquiry, the trial court had the statutory obligation "to provide the jury with information the jury desires on points of law."

*(People v. Smithey* (1999) 20 Cal.4th 936, 985 [86 Cal.Rptr.2d 243, 978 P.2d 1171]; see also *People v. Waidla* (2000) 22 Cal.4th 690, 745–746 [94 Cal.Rptr.2d 396, 996 P.2d 46].) Under "section 1138 the court must attempt 'to clear up any instructional confusion expressed by the jury.' [Citation.]" *(People v. Giardino* (2000) 82 Cal.App.4th 454, 465 [98 Cal.Rptr.2d 315].) "This means the trial 'court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. . . .' [Citation.]" *(People v. Solis* (2001) 90 Cal.App.4th 1002, 1015 [109 Cal.Rptr.2d 464]; see also *People v. Smithey, supra,* at p. 985; *People v. Davis* (1995) 10 Cal.4th 463, 522 [41 Cal.Rptr.2d 826, 896 P.2d 119].) The trial court had the further duty in the case to instruct the jury on the law relevant to the issues raised by the evidence. *(People v. Jennings* (2010) 50 Cal.4th 616, 667 [114 Cal.Rptr.3d 133, 237 P.3d 474]; *People v. Saddler* (1979) 24 Cal.3d 671, 681 [156 Cal.Rptr. 871, 597 P.2d 130].)

Although the prosecution pursued what it viewed as the strongest case against Ardoin by arguing that he was the actual killer, the evidence presented at trial also suggested the jury might find him guilty under the felony-murder rule as a perpetrator of the robbery and aider and abettor of the crime committed by another. Despite the focus of the prosecution and defense theories of the case, the court properly modified the felony-murder instruction in accordance with the evidence presented by including a reference to both defendants. (See *People v. Alexander, supra,* 49 Cal.4th 846, 920–921.) "[T]he court is not *precluded* from giving any instruction for which there is evidentiary support. The fact that a party did not pursue a particular theory does not preclude the trial judge from giving an instruction on that theory where it deems such an instruction to be appropriate." *(U.S. v. Horton* (4th Cir. 1990) 921 F.2d 540, 544.) The trial " 'judge must always be alert to the possibility that counsel in the course of argument may have befuddled the jury as to the law. If this occurs, then either at the time the confusion arises or as part of the final instructive process the judge should rearticulate the correct rule of law.' " *(People v. Chung, supra,* 57 Cal.App.4th 755, 758, quoting *People v. Valenzuela* (1977) 76 Cal.App.3d 218, 221 [142 Cal.Rptr. 655].) The court has "a duty to reinstruct if it becomes apparent that the jury may be confused on the law." *(Chung, supra,* at p. 758.) Thus, we find that upon the jury's inquiry in the present case the trial court acted properly by reading the modified felony-murder instruction to dispel confusion and correctly advise the jury on the law governing the case. (See *U.S. v. Hayes* (9th Cir. 1986) 794 F.2d 1348, 1353–1354; *People v. Beardslee* (1991) 53 Cal.3d 68, 97 [279 Cal.Rptr. 276, 806 P.2d 1311].)

■ We cannot dispute the premise, however, that once the trial court decided to clarify the felony-murder instruction to include both defendants, fairness dictated that the court also reopen the case for the limited purpose of granting Ardoin's counsel the right to offer rebuttal argument. (See *People v. Cuccia* (2002) 97 Cal.App.4th 785, 793–794 [118 Cal.Rptr.2d 668].) To prevent unfair prejudice, if a supplemental instruction introduces new matter for consideration by the jury, the parties should be given an opportunity to argue the theory. (*U.S. v. Fontenot* (9th Cir. 1994) 14 F.3d 1364, 1368; *People v. Bishop* (1996) 44 Cal.App.4th 220, 231–235 [51 Cal.Rptr.2d 629].) "The Sixth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution guarantee a criminal defendant the right to the effective assistance of counsel at all critical stages of the proceedings." (*People v. Bishop, supra*, at p. 231.) " 'To effectuate the constitutional rights to counsel and to due process of law, an accused must . . . have a reasonable opportunity to prepare a defense and respond to the charges.' [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 670 [27 Cal.Rptr.3d 360, 110 P.3d 289].) If supplemental or curative instructions are given by the trial court without granting defense counsel an opportunity to object, and if necessary, offer additional legal argument to respond to the substance of the new instructions, the spirit of section 1093.5 and the defendant's right to a fair trial may be compromised. (*Cooper v. Superior Court* (1961) 55 Cal.2d 291, 302 [10 Cal.Rptr. 842, 359 P.2d 274]; *People v. Sanchez* (1978) 83 Cal.App.3d Supp. 1, 7 [147 Cal.Rptr. 850]; *People v. Lockheed Shipbuilding & Constr. Co.* (1975) 50 Cal.App.3d Supp. 15, 34 [123 Cal.Rptr. 778].)[10]

To support his claim of prejudicial denial of the rights to effective assistance of counsel and due process, Ardoin relies primarily on two decisions from the federal courts which dealt with violations of Federal Rules of Criminal Procedure, rule 30(b) (18 U.S.C.) (Rule 30(b)),[11] the federal

---

[10] In fact, rule 2.1036 of the California Rules of Court expressly encourages the trial courts to clarify previous instructions or give additional instructions, and permit attorneys "to make additional closing arguments," if a jury has "reached an impasse in its deliberations." (See also *People v. Young* (2007) 156 Cal.App.4th 1165, 1171–1172 [67 Cal.Rptr.3d 899].) We have no difficulty in concluding that the same rule applies when a jury expresses confusion and an impasse in its deliberations related to the governing law and instructions, particularly in light of the trial court's broad discretion to alter the sequence of trial proceedings. (See *People v. Chung, supra*, 57 Cal.App.4th 755, 758–759.)

[11] Rule 30 of the Federal Rules of Criminal Procedure (18 U.S.C.) provides in full: "(a) In General. Any party may request in writing that the court instruct the jury on the law as specified in the request. The request must be made at the close of the evidence or at any earlier time that the court reasonably sets. When the request is made, the requesting party must furnish a copy to every other party. [¶] (b) Ruling on a Request. The court must inform the parties before closing arguments how it intends to rule on the requested instructions. [¶] (c) Time for Giving Instructions. The court may instruct the jury before or after the arguments are completed, or at both times. [¶] (d) Objections to Instructions. A party who objects to any

version of section 1093.5: *Sheppard, supra*, 909 F.2d 1234; and *U.S. v. Gaskins* (9th Cir. 1988) 849 F.2d 454 (*Gaskins*).

In *Sheppard*, the defendant was charged with murder and prosecuted on the sole theory the killing was premeditated, willful and deliberate. As in the case before us, the defendant was not charged with robbery. Just prior to closing arguments, the prosecutor requested instructions on robbery and felony murder, which were given over the defendant's objection. (*Sheppard, supra*, 909 F.2d 1234, 1235.) The trial court instructed the jury on a felony-murder theory and the prosecutor argued that theory to the jury during closing arguments. (*Id.* at p. 1236.) The Ninth Circuit court found that the defendant's rights to due process and the effective assistance of counsel had been denied by the procedure, with the explanation: "A trial cannot be fair unless the nature of the charges against a defendant are adequately made known to him or her in a timely fashion. [Citation.] Here, the prosecutor 'ambushed' the defense with a new theory of culpability after the evidence was already in, after both sides had rested, and after the jury instructions were settled. This new theory then appeared in the form of unexpected jury instructions permitting the jury to convict on a theory that was neither subject to adversarial testing, nor defined in advance of the proceeding. [¶] Moreover, the right to counsel is directly implicated. That right is next to meaningless unless counsel knows and has a satisfactory opportunity to respond to the charges against which he or she must defend." (*Id.* at p. 1237.) The court reversed the conviction, concluding it could not "regard as fair a trial in which the defendant's right to defend was impaired by a lack of notice as to the nature and cause of the accusation." (*Id.* at p. 1238.)

And in *Gaskins, supra*, 849 F.2d 454, in the course of discussion of instructions on charges of possession of methamphetamine and manufacturing methamphetamine the prosecutor requested an instruction on aiding and abetting. In response, defense counsel requested a special instruction on unanimity to inform the jurors that their verdict must be unanimous on the theory of the defendant's guilt—as either a principal or as an aider and abettor—but ultimately counsel agreed with the trial court's decision not to give either instruction. (*Id.* at p. 456.) During deliberations the jurors sent the court a question which suggested they were considering an aiding-and-abetting theory of culpability on the charge of manufacturing methamphetamine, based on evidence that the manufacturing process occurred on the defendant's property. Over defense counsel's objection the trial court instructed on aiding and abetting. The trial court also denied requests by

portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate. An opportunity must be given to object out of the jury's hearing and, on request, out of the jury's presence. Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)."

defense counsel to instruct on unanimity and to reopen closing arguments to address the aiding-and-abetting theory of culpability. (*Id.* at pp. 456–457.)

The court in *Gaskins* found that the trial court's procedure violated federal Rule 30(b), which like section 1093.5 requires defense counsel to be informed of proposed instructions prior to closing arguments, so counsel has "the opportunity to argue the case intelligently to the jury." (*Gaskins, supra,* 849 F.2d 454, 458.) The court declared that noncompliance is "reversible error, however, 'only if counsel's closing argument was prejudicially affected thereby.' [Citations.]" (*Ibid.*; see also *U.S. v. Mason* (9th Cir. 1990) 902 F.2d 1434, 1438 & fn. 3.) Under this standard prejudice is found "if the party was unfairly prevented from arguing his or her defense to the jury or was substantially misled in formulating and presenting arguments." (*Gaskins, supra,* at p. 458.) The court thus focused upon "whether the district judge's decision to give the aiding and abetting instruction during jury deliberations, after initially stating . . . that he would not, unfairly prevented Gaskin's counsel from arguing against an aiding and abetting theory to the jury." (*Id.* at p. 460, italics omitted.) The court observed that "convicting a defendant as a principal or convicting a defendant as an aider and abettor are based on two conceptually different theories." (*Id.* at p. 459.) The convictions were therefore reversed when review of the transcript of closing argument revealed that "Gaskin's counsel did not address the question whether providing a location for the laboratory, without more, would constitute aiding and abetting the manufacture of methamphetamine. Instead, her argument focused on the question whether her client had directly participated in the manufacturing process. Moreover, she did not argue the facts as they would relate to the principle that 'mere presence' at the scene of a crime and knowledge that a crime is being committed is not sufficient to establish that an accused aided and abetted, unless the prosecution proves beyond a reasonable doubt that the defendant was a participant, and not merely a knowing spectator." (*Id.* at p. 460.)

 Even if the error identified in *Sheppard* and *Gaskins* occurred in the present case, the prejudice did not. First, as we have observed, through the first degree murder charge and evidence presented at trial Ardoin was provided with notice of his potential culpability under the felony-murder rule as an aider and abettor of the murder committed by another during the course of a felony. (See *People v. Carey, supra,* 41 Cal.4th 109, 131–132; *People v. Hughes* (2002) 27 Cal.4th 287, 369–370 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Bishop, supra,* 44 Cal.App.4th 220, 232; *People v. Scott* (1991) 229 Cal.App.3d 707, 716–717 [280 Cal.Rptr. 274].) " '[A] defendant, charged with murder, is on notice that the prosecution may seek to prove that charge by showing that the homicide occurred during the commission of an enumerated felony.' [Citations.]" (*People v. Crawford* (1990) 224 Cal.App.3d 1, 8

[273 Cal.Rptr. 472], quoting *People v. Murtishaw* (1981) 29 Cal.3d 733, 751, fn. 11 [175 Cal.Rptr. 738, 631 P.2d 446].) Nor did the trial court affirmatively advise the defense that Ardoin was excluded from the felony-murder instruction, in contrast to the misleading assurance given to defense counsel in *Sheppard*.[12] (Cf. *People v. Scott, supra*, at p. 717.) The revision of the instruction in response to the jury's inquiry alleviated the trial court's failure to include both defendants in the original felony-murder and aiding-and-abetting instructions, a mistake which may have happened inadvertently.

The record also convincingly illustrates to us defense counsel's awareness during argument that felony-murder and aiding-and-abetting principles were at issue in the case. (*U.S. v. Tham* (9th Cir. 1992) 960 F.2d 1391, 1399.) The evidence offered at trial disclosed and repeatedly confirmed that the murder occurred during the course of the robbery of drugs from the victim. (*People v. Wilson* (2008) 43 Cal.4th 1, 17 [73 Cal.Rptr.3d 620, 178 P.3d 1113]; *People v. Scott, supra*, 229 Cal.App.3d 707, 717.) In closing argument the prosecutor referred to felony-murder and aiding-and-abetting principles, on some occasions without singling out Jaquez. Again in contrast to both *Gaskins* and *Sheppard*, in response the defense did not focus exclusively on contesting the evidence of Ardoin's direct participation in the murder. (See also *U.S. v. Cook* (9th Cir. 2005) 155 Fed.Appx. 970, 971.) Ardoin's primary defense was that he was not present at all when the murder occurred, and therefore was neither the perpetrator nor the aider and abettor of the robbery and murder.

Defense counsel expressly mentioned the prosecutor's position that Ardoin might be guilty under either of "two scenarios" presented by the evidence: as the direct "killer" of the victim, or as an "aider or abettor and not actually the killer." Defense counsel supported his ensuing argument that the aiding-and-abetting theory was "speculation" with numerous assertions based on the prosecution's failure to prove the elements of felony murder and aiding and abetting: the evidence did not prove Ardoin was even at the scene "prior to and at the time of death" of the victim; the chief prosecution witness, Burgos, who placed him at the scene, lacked any credibility; the phone and cab ride records supported the defense claim that Ardoin was not present when Tom was robbed and killed; Ardoin lacked "physical capability" to kill the victim or assist with the killing; Burgos did not *see* Ardoin rob the victim or "help

---

[12] The holding in *Sheppard* has been described by subsequent Ninth Circuit authority as "narrow." (*Morrison v. Estelle* (9th Cir. 1992) 981 F.2d 425, 428.) It is limited to the particular instance where the prosecution specifically advises defense counsel of the limited theory of a particular prosecution, and then that prosecutor and the trial court allow an alternative theory in argument. The suggestion of an alternative theory for criminal responsibility in the criminal proceedings reviewed negates application of the "*Sheppard* rule." (*Id.* at p. 427; see also *Stephens v. Borg* (9th Cir. 1995) 59 F.3d 932, 935–936; *Barr v. Runnels* (E.D.Cal., Sept. 14, 2010, No. CIV S-05-2091 LKK EFB P) 2010 U.S.Dist. Lexis 95802.)

somebody" do so; and the DNA evidence was "circumstantial" and not dispositive of Ardoin's guilt under any theory. Later in closing argument defense counsel reiterated that the prosecution offered a "new aiding-and-abetting theory," and again emphasized the "absence" of evidence to support it: the mere "speculation" that Ardoin arrived at Tom's house before the murder; the lack of evidence that Tom's drugs were found in Ardoin's home or that he sold drugs after the murder; that Ardoin did not go to a hotel, attempt to flee, or concoct a fabricated version of the murder, as did Jaquez and Burgos; and that Ardoin did not have a "compelling motive" to participate in a robbery of Tom.

The belatedly clarified supplemental felony-murder *instruction* thus did not introduce any new and different theory or factual elements into the case to be contested by the defense. (*U.S. v. Fontenot, supra*, 14 F.3d 1364, 1368; *U.S. v. Pemberton* (9th Cir. 1988) 853 F.2d 730, 735.) At oral argument Ardoin stressed the distinction between the theories of aiding and abetting and felony murder. He further pointed out that only aiding and abetting was mentioned as a basis of liability during closing argument. He is of course correct that aiding and abetting and felony murder are different theories upon which criminal liability may be based. (See *People v. Davis* (1992) 8 Cal.App.4th 28, 33 [10 Cal.Rptr.2d 381].) For purposes of opportunity to present argument in the present case, however, the robbery and homicide were part of a single, continuous transaction, which brought into operation the felony-murder rule's imposition of culpability for the homicide as an accomplice to the robbery. (See *People v. Pulido* (1997) 15 Cal.4th 713, 723 [63 Cal.Rptr.2d 625, 936 P.2d 1235].) Nor was the jury called upon to decide whether Ardoin's guilt was due to his acts as the direct perpetrator of the robbery and murder, or instead as an aider and abettor of the robbery that resulted in the murder by another. " 'It matters not that jurors may disagree over the theory of the crime, for example, whether the situation involves felony murder or premeditated murder. Nor does it matter that they disagree on the theory of participation, for example, whether there was direct participation or aiding and abetting or coconspiracy.' " (*People v. Vargas* (2001) 91 Cal.App.4th 506, 558 [110 Cal.Rptr.2d 210], quoting *Davis, supra*, at p. 34.) In the context of the facts and legal principles presented, argument on felony-murder and aiding-and-abetting theories were not distinctive in the case.[13]

To the extent that Ardoin's counsel may not have argued against felony-murder liability in as much detail as he, upon subsequent reflection, would have liked, as the substitute trial judge recognized, defense counsel knew the issue had been presented and took the opportunity to vigorously

---

[13] We observe that the failure of the court to also modify the aiding-and-abetting instructions to include Ardoin can only have inured to his benefit.

contest it. The right to due process guarantees an opportunity for effective presentation of a defense, not the presentation of a defense that is as effective as a defendant might prefer. (See *United States v. Owens* (1988) 484 U.S. 554, 559 [98 L.Ed.2d 951, 108 S.Ct. 838]; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1039 [47 Cal.Rptr.3d 467, 140 P.3d 775]; *People v. Carter* (2005) 36 Cal.4th 1114, 1172 [32 Cal.Rptr.3d 759, 117 P.3d 476].) ▮ In short, counsel was not ambushed by the modified instruction. He adequately addressed the alternative felony-murder and aiding-and-abetting theories of liability during his final argument.

While we cannot express our approval of the trial court's refusal to reopen the case, the error is one that requires reversal only if, viewing the record in its entirety, a party " 'was unfairly prevented from arguing his or her defense to the jury or was substantially misled in formulating and presenting arguments.' [Citation.]" (*U.S. v. Foppe* (9th Cir. 1993) 993 F.2d 1444, 1451; see also *U.S. v. Hermosillo-Nanez* (9th Cir. 1976) 545 F.2d 1230, 1233.) "The question is whether this court can 'conclude that the effectiveness of counsel's argument and hence of appellant's defense was not impaired by counsel's inaccurate information regarding the court's charge.' [Citation.]" (*U.S. v. Cook, supra*, 155 Fed.Appx. 970, 971.) We conclude that Ardoin was not substantially misled in formulating or presenting closing argument, nor was he unfairly prevented from imparting his defense to the jury. (*U.S. v. Baron* (7th Cir. 1979) 602 F.2d 1248, 1253–1254; *U.S. v. Williams* (5th Cir. 1971) 447 F.2d 894, 901; *People v. Bishop, supra*, 44 Cal.App.4th 220, 235.) Moreover, from our reading of the record we do not perceive that defense counsel's argument on the felony-murder issue would have appreciably differed or been any more persuasive if the case had been reopened. "Though one can always argue longer and more fully, these arguments [(principal and aiding and abetting)] were sufficiently developed in the initial closing." (*U.S. v. Horton, supra*, 921 F.2d 540, 548.) Ardoin has not demonstrated prejudicial error or deficient performance by counsel. (*People v. Young, supra*, 156 Cal.App.4th 1165, 1172.)

II. *The Admission of Extrajudicial Statements by Codefendant Jaquez.*

Ardoin contends the trial court erred by denying his mistrial motion following the testimony of Burgos in which she referred to an extrajudicial statement of codefendant Jaquez. He claims that the admission of evidence of his codefendant's statements violated his Sixth Amendment confrontation rights as articulated in *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620] (*Bruton*), and *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] (*Aranda*). The challenged testimony by Burgos was elicited in the context of the prosecutor's effort to

obtain an explanation for her decision to ultimately testify against Jaquez and "tell the truth about what happened." Burgos testified that she "waited three years for somebody to say something" that exonerated her. Specifically, Burgos objected to the failure of Jaquez to follow through with his assurance to her that he "would talk to the person" who committed the murder and "have them stand up and say what they did." Upon defense counsel's objection the trial court struck the portion of Burgos's testimony that referred to "any persons" other than her or Jaquez, and admonished the jury "not to consider that portion of the testimony for any purpose whatsoever." Defense counsel also asserted that prosecutorial misconduct had been committed and moved for a mistrial. The trial court found that the prosecutor did not adduce the testimony intentionally, and denied the motion for mistrial on the ground that the admonition "cured the problem."

Ardoin maintains that Jaquez's statement as related by Burgos, although it did not refer to him by name, " 'facially' incriminated him. (See *People v. Archer* (2000) 82 Cal.App.4th 1380, 1390 [99 Cal.Rptr.2d 230].)" He also complains that the trial court's admonition did "not cure [the] *Aranda-Bruton* error," and the violation of his right to confrontation "was not harmless beyond a reasonable doubt."

■■■ "*Aranda* and *Bruton* stand for the proposition that a 'nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given.' [Citation.]" (*People v. Jennings, supra,* 50 Cal.4th 616, 652.) " 'In *Bruton,* the United States Supreme Court held that the admission into evidence at a joint trial of a nontestifying codefendant's confession implicating the defendant violates the defendant's right to cross-examination guaranteed by the confrontation clause, even if the jury is instructed to disregard the confession in determining the guilt or innocence of the defendant. [Citation.] The high court reasoned that although juries ordinarily can and will follow a judge's instructions to disregard inadmissible evidence, "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." [Citation.] Such a context is presented when "the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." [Citation.]' [Citation.]" (*People v. Burney* (2009) 47 Cal.4th 203, 230 [97 Cal.Rptr.3d 348, 212 P.3d 639], quoting *People v. Lewis* (2008) 43 Cal.4th 415, 453 [75 Cal.Rptr.3d 588, 181 P.3d 947].)

"[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." (*Richardson v. Marsh* (1987) 481 U.S. 200, 211 [95 L.Ed.2d 176, 107 S.Ct. 1702] (*Richardson*).) " ' "[T]he sufficiency of this form of editing must be determined on a case-by-case basis in light of the statement as a whole and the other evidence presented at the trial." ' [Citation.] ' "[R]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration . . . leave statements that, considered as a class, so closely resemble *Bruton*'s unredacted statements that . . . the law must require the same result." ' [Citation.] When, despite redaction, the statement obviously refers directly to the defendant, and involves inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial, the *Bruton* rule applies and introduction of the statement at a joint trial violates the defendant's rights under the confrontation clause." (*People v. Burney, supra,* 47 Cal.4th 203, 231.) However, "the United States Supreme Court has stated that the positive authority of *Bruton v. United States, supra,* 391 U.S. 123 (holding that the admission, at a joint trial, of a nontestifying defendant's confession implicating a codefendant, even with an appropriate limiting instruction, violates the codefendant's rights under the confrontation clause) extends only to confessions that are not only '*powerfully incriminating*' but also '*facially incriminating*' of the non-declarant defendant. [Citation.]" (*People v. Fletcher* (1996) 13 Cal.4th 451, 455–456 [53 Cal.Rptr.2d 572, 917 P.2d 187], italics added.)

 Here, Burgos's reference to the statement by Jaquez did not mention Ardoin by name. Burgos reported that Jaquez told her he "would talk to the person" who committed the murder, and "have *them*," apparently referring to both Jaquez and the other person, "stand up and say what *they* did." (Italics added.) Jaquez's statement thus made a direct reference to a perpetrator other than the speaker, but the statement was intrinsically redacted. On her own, Burgos replaced Ardoin's name with the pronouns "person" and "they." "[W]hether this kind of editing—which retains references to a coparticipant in the crime but removes references to the coparticipant's name—sufficiently. protects a nondeclarant defendant's constitutional right of confrontation may not be resolved by a 'bright line' rule of either universal admission or universal exclusion. Rather, the efficacy of this form of editing must be determined on a case-by-case basis in light of the other evidence that has been or is likely to be presented at the trial. The editing will be deemed insufficient to avoid a confrontation violation if, despite the editing, reasonable jurors could not avoid drawing the inference that the defendant was the

coparticipant designated in the confession by symbol or neutral pronoun." (*People v. Fletcher, supra*, 13 Cal.4th 451, 456.)

Several factors strike us as limiting both the incriminating nature of the statement and the risk that a jury could not follow the trial court's instruction to disregard the evidence. First, the extrajudicial statement by Jaquez is neither testimonial in nature under *Crawford v. Washington* (2004) 541 U.S. 36, 68–69 [158 L.Ed.2d 177, 124 S.Ct. 1354],[14] nor a powerfully incriminating confession. Jaquez gave an assurance to Burgos that he and the other person responsible for the murder would come forward and "say something" to exculpate her. Nothing in the evidence constitutes an overtly incriminating confession. Second, the statement is not directly or "facially" incriminating. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 282 [85 Cal.Rptr.3d 393].) The inference is concededly obvious that Jaquez was referring to Ardoin as the coparticipant designated in the statement, but reference to the remainder of Burgos's testimony is necessary to fully recognize the incriminating nature of the statement. Moreover, the statement was not hearsay evidence, as it was not offered for the truth of the matter, but only to reflect upon the witness's state of mind and the reasons that convinced her to "change [her] mind" and testify against defendants.[15]

The trial court's instruction thus alleviated the harm associated with the obliquely incriminating statement. "A *Bruton* problem exists only where a co-defendant's statement on its face implicates the defendant." (*U.S. v. Najjar* (4th Cir. 2002) 300 F.3d 466, 475.) In *Richardson, supra*, 481 U.S. 200, 208, the United States Supreme Court observed: "There is an important distinction between this case and *Bruton*, which causes it to fall outside the narrow exception we have created. In *Bruton*, the codefendant's confession 'expressly implicat[ed]' the defendant as his accomplice. [Citation.] Thus, at the time that confession was introduced there was not the slightest doubt that it would prove 'powerfully incriminating.' [Citation.] By contrast, in this case the confession was not incriminating on its face, and became so only when

---

[14] A statement is testimonial under *Crawford* if it was made in a formal proceeding or in response to structured police questioning, or obtained for the purpose of potentially using it in a criminal trial or determining if a criminal charge should issue. (*Crawford v. Washington, supra*, 541 U.S. 36, 68; see also *People v. Taulton* (2005) 129 Cal.App.4th 1218, 1224 [29 Cal.Rptr.3d 203].) Jaquez's statement to his wife is not testimonial. (See *People v. Griffin* (2004) 33 Cal.4th 536, 579–580, fn. 19 [15 Cal.Rptr.3d 743, 93 P.3d 344]; *People v. Taulton, supra*, at p. 1224.)

[15] Cases have declared that the *Aranda/Bruton* rule applies only if a codefendant's statement is hearsay and inadmissible against the defendant. (See *U.S. v. Hamilton* (7th Cir. 1994) 19 F.3d 350, 354–357; *People v. Smith* (2005) 135 Cal.App.4th 914, 921–922 [38 Cal.Rptr.3d 1]; *People v. Greenberger, supra*, 58 Cal.App.4th 298, 331–332.)

linked with evidence introduced later at trial (the defendant's own testimony)." (See also *U.S. v. Locklear* (4th Cir. 1994) 24 F.3d 641, 646; *U.S. v. Small* (E.D.Va., Apr. 11, 2006, No. 4:06cr6) 2006 U.S.Dist. Lexis 18433, pp. *32–*33.) "Express incrimination is more vivid than inferential incrimination and more difficult to thrust out of the mind. While the express incrimination of the confession in *Bruton* justified the belief the jury will likely disobey the instruction not to consider the evidence, there is no overwhelming probability the jury will not obey the limiting instruction to disregard the confession in assessing defendant's guilt when the confession incriminates only by inference." (*People v. Song* (2004) 124 Cal.App.4th 973, 983 [22 Cal.Rptr.3d 118].)

"[N]o constitutional violation occurs where a co-defendant's statement is not incriminating on its face, and becomes so only when linked to other admitted evidence, if the trial court gives a proper limiting instruction. *Richardson*, 481 U.S. at 208, 211; *Mason v. Yarborough*, 447 F.3d 693, 695 (9th Cir. 2006) (*Richardson* 'specifically exempts a statement, not incriminating on its face, that implicates the defendant only in connection to other admitted evidence'); *United States v. Hoac*, 990 F.2d 1099, 1105 (9th Cir. 1993) ('a codefendant's statement that does not incriminate the defendant unless linked with other evidence introduced at trial does not violate the defendant's Sixth Amendment rights')." (*Gomez-Perez v. McDonald* (E.D.Cal. 2011) 2011 U.S.Dist. Lexis 7009, p. *23.)

By striking the testimony of Burgos that referred "to any persons other than the witness" and Jaquez, and admonishing the jury "not to consider that portion of the testimony for any purpose whatsoever," the trial court effectively prevented a violation of Ardoin's confrontation rights under the *Aranda/Bruton* rule. (*People v. Garcia, supra,* 168 Cal.App.4th 261, 281–283.) And, even if we found a constitutional violation, under the circumstances presented we would find the error harmless beyond a reasonable doubt, even in conjunction with the refusal to reopen the case following the revised felony-murder instructions. (*People v. Jennings, supra,* 50 Cal.4th 616, 652; *People v. Burney, supra,* 47 Cal.4th 203, 232.)

 Therefore, the trial court did not err by denying Ardoin's motion for a mistrial. "A trial court should grant a motion for mistrial 'only when " 'a party's chances of receiving a fair trial have been irreparably damaged' " [citation], that is, if it is 'apprised of prejudice that it judges incurable by admonition or instruction' [citation]." (*People v. Avila* (2006) 38 Cal.4th 491, 573 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) "We review a trial court's ruling on a motion for mistrial for abuse of discretion." (*People v. Valdez* (2004) 32 Cal.4th 73, 128 [8 Cal.Rptr.3d 271, 82 P.3d 296].) The trial court did not abuse its discretion by declining to declare a mistrial.

## DISPOSITION

Accordingly, the judgments against both defendants are affirmed.

Margulies, Acting P. J., and Banke, J., concurred.

Appellants' petition for review by the Supreme Court was denied September 14, 2011, S194083.