Filed 1/14/16  P. v. Gutierrez CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LUIS HERNANDEZ GUTIERREZ,<br><br>    Defendant and Appellant. | B259135<br><br>(Los Angeles County<br>Super. Ct. No. BA393911) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Edmund W. Clarke, Jr., Judge.  Affirmed.

Jennifer Hansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, David D. Madeo, Deputy Attorney General, for Plaintiff and Respondent.

_____

The People charged defendant Luis Gutierrez with a single count of murder in violation of Penal Code section 187[1] along with a gang crime enhancement pursuant to section 186.22, subdivision (b), and gun enhancements pursuant to section 12022.53, subdivision (b), (c) and (d), through (e)(1). The jury convicted the defendant of second degree murder and found all enhancements true. The trial court sentenced defendant to 40 years to life consisting of consecutive terms for 15 years to life on second degree murder, and, 25 to life for one of the gun enhancements. On appeal, defendant contends (1) the trial court committed error by denying defendant's section 1118.1 motion; (2) insufficient evidence supports his conviction of second degree murder under the natural and probable consequences doctrine; (3) the trial court violated his constitutional rights when it denied his request to recall two prosecution witnesses; and (4) the trial court violated his constitutional rights when it instructed the jury on the natural and probable consequences doctrine during deliberations. We find no error and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Murder At MacArthur Park*

On October 26, 2011, Diego Davian was sitting on a park bench in MacArthur Park at around 7:00 p.m. when he was shot twice from behind. One bullet exited his neck, while the other, his upper chest. Both were fatal.

Surveillance video from the park captured the shooting. According to the testimony from Los Angeles Police Department (LAPD) Detective Christopher Linscomb, the video shows two individuals walking up to the victim who is sitting on a bench along a walkway inside the park. Muzzle flashes are seen as one of the individuals raises his arm towards the victim. The victim runs away while the two individuals run off westbound.

---

[1] All future undesignated statutory references are to the Penal Code unless otherwise indicated.

*Defendant's Arrest and Statements*

Defendant was arrested on February 10, 2012. At Rampart station, LAPD Officer Danny Arona, posing as a gang member from the Mara Salvatrucha (MS) gang was placed in defendant's holding cell to gather information. Arona told the defendant he was arrested for robbery and that he was from the MS Hollywood clique. The only other person in the cell was the defendant. The defendant told Arona he was from MS Park View clique. During Arona's conversation with defendant, one of the detectives assigned to the murder investigation came into the cell to stimulate conversation by making certain statements concerning Davian's shooting. After the detective left, Arona asked defendant why he was in custody. The defendant pointed at the detective who had left and said, "[f]or that." According to Arona, defendant indicated the victim was a "chavala," a derogatory term used by MS gang members when referring to an enemy, including the 18th Street gang. He stated "Espanto" did the shooting and that he used a .357 revolver.

On the same day, defendant was interviewed by detectives. Defendant initially distanced his involvement. He indicated people tied him with MS but that he was not a gang member. Defendant indicated he observed two people involved in the shooting. When confronted with the video and advised to tell the truth, defendant indicated he would be killed if he talked. After being pushed by the detectives to tell the truth, defendant began to give more information. He said, the other person told him to look out for the police. Defendant stated the other person's name is "Cipote" from MS Park View clique. Defendant identified Cipote as the shooter in a six pack.[2] When confronted by the detective to be more forthcoming, defendant stated he would be killed and asked the detectives for protection. Defendant stated he met up with Cipote before the shooting and was told to go with him. An older MS gang member named Guacal told Cipote and the defendant that they were to go pick something up. Defendant thought it had something to do with drugs. Defendant and Cipote went to the park on bicycles. Once at

---

[2]    "Cipote" is Juan Gamez. Gamez was arrested and charged along with the defendant for the murder of Diego Davian. Gamez's case was severed for trial on a motion filed by the defendant.

3

the park, Cipote told defendant to look out for the police and without telling him why and walked away. Defendant heard two gunshots. Afterwards, he and Cipote ran away. Before going to the park, Guacal told Cipote and defendant that "he's there, he's there . . go with him." Defendant indicated, "I don't know why they killed him. [Guacal] was just telling [Cipote], 'He's there, he's there.' Like I said, since I'm - they don't consider me for everything. The gang's like that, they . . . they exclude you."

*Gang Evidence Adduced At Trial*

During the jury trial, the prosecutor called two witnesses, LAPD officers Nellie Knight, and Jesus Placencia, to elicit gang evidence.

Knight testified she worked the gang enforcement detail assigned to the MS gang. She made three contacts with defendant. On October 22, 2011, Knight encountered defendant, along with Gamez and a female identified as Jocelyn. Knight completed a field identification card for defendant and Gamez. Gamez identified his moniker as "Sipote." Knight observed gang tattoos on Gamez including an "M.S." on top of his head. On November 28, 2011, Knight contacted defendant again with Gamez. Defendant admitted membership with MS from Park View clique. On December 15, 2011, Knight made contact with defendant who was with five other MS gang members, including Gamez.

Placencia testified as the gang expert. Before his current assignment in the Robbery-Homicide Division, he was assigned to the gang enforcement detail and monitored the MS gang. Placencia testified that since the mid-1980's, MS has grown dramatically and now covers 44 states in the United States, as well as Central America, and has a membership of close to 40,000. MS is broken down into cliques, each controlling a geographic territory. Within the Rampart Division of the LAPD, there are three MS cliques: Coronado, Park View, and Rampart. Park View's territory is bounded by 6th Street to the north, Olympic to the south, Hoover to the west, and Alvarado to the east. MacArthur Park is within the territory claimed by MS Park View clique. MS Park View clique and 18th Street gang share a border. MS and 18th Street are rivals. "Chavala" is a derogatory term used by MS gang members to disrespect 18th Street gang

4

members. The primary activities of the MS gang are extortion, robbery, assault with a deadly weapon and murder. MS gang members often commit crimes in a group to increase their level of respect within the gang. It is also done to show rival gangs they are active and to increase their violent reputation. The MS gang is territorial and demand respect from the community and rival gangs. In order to gain respect, they intimidate the community and rival gangs by committing violent crimes.

Placencia further testified he encountered defendant on two to three occasions and in those contacts, defendant admitted membership in MS Park View clique. He opined defendant is a member of MS Park View clique. Placencia also testified he knew Gamez was a member of MS Park View clique.

When presented with a hypothetical with facts mirroring the incident, Placencia testified the shooting benefitted the MS gang as a brazen act of violence in the middle of MacArthur Park which enhanced their violent reputation. He further opined the two gang members worked in association with one another to commit the crime.

*Instructing the Jury After Deliberations Began*

The prosecutor tried the case under a theory defendant directly aided and abetted the murder committed by Gamez. This is reflected in the prosecutor's comments to the jury during opening statement and at the initial closing argument.

The trial court instructed the jury prior to closing argument. On the theory of aiding and abetting, the trial court gave CALCRIM No. 400 (Aiding and Abetting: General Principles) and CALCRIM No. 401 (Aiding and Abetting: Intended Crimes). It did not give CALCRIM No. 403 (Aiding and Abetting: Natural and Probable Consequences - Only Non-Target Offense Charged).

Jurors began deliberation on Friday June 6, 2014. The following Monday, June 9, 2014, the jury asked three questions.

QUESTION 1: "Clarification please: When the judge gave us instructions, he spoke of Murder 1 and Murder 2. Is 2nd degree murder an option in this case?"

5

QUESTION 2: "Is it possible for the shooter to be guilty of 1st degree murder while the aider and abettor is guilty of 2nd degree murder?"

QUESTION 3: "If the jury believes it has been proven beyond a reasonable doubt that the [defendant] knew the [perpetrator] intended to commit a violent crime though not [necessarily] murder and intends and in fact does assist, and the result is 1st degree murder by [perpetrator]; does that imply the [defendant] is guilty of A&A [aiding and abetting] 1st degree murder, 2nd degree murder, or not guilty?"

In response to Question 3, the prosecutor made a request to the trial court to instruct the jury with the natural and probable consequences doctrine with a target offense of assault. Defense counsel observed the natural and probable consequences doctrine was not the theory on which the prosecutor tried the case. At that time, the trial court decided not to instruct on the natural and probable consequences doctrine and re-directed the jury to some of the instruction already given.

Later that day, the juror indicated they were at an impasse. The trial court reassembled the jurors to take a poll. It asked whether any help from the court would assist the jury in rendering a verdict. All except Juror No. 8 agreed the jury was at an impasse. After further discussions on the topic of confusion, it was decided Juror No. 8 would formulate a question for the trial court. Before leaving for the day, the jurors submitted their next written question.

QUESTION 4: "Please clarify Instruction 401, item 2: Is this specific to the crime of murder (The crime) or does it apply to A crime (any intended crime) that may lead to murder."

The next day, the parties argued on how to respond to the jury's latest question. Defense counsel explained if he knew the prosecution intended to argue the natural and probable consequences doctrine as a theory of liability, he would have asked law enforcement witnesses how frequent target offenses are committed and how often they result in homicides. The following exchange took place between defense counsel and the trial court.

6

"[Counsel]: Basic question is when I have a natural and probable consequence, when I know what the target offense is, how many of these target offenses are omitted by this gang. Perfect for the gang officer. And out of these target offenses, how many result in a homicide? How many result in this. How many result in that? Those are the type of questions.

Court: So the jury would know, from the data base of the officer, of crimes, what the probability is that someone who meets another man in a park with a handgun would know that he intends to commit a simple assault, which is murder. I think that's thin. But what would you be calling officer ----- or Detective Arteaga for.

[Counsel]: We're assuming now it's for the target crime of the assault?

Court: Yes.

[Counsel]: Okay.

Court: If [the prosecutor's] current position was known to you before you cross examined any witnesses. So now you're trying to repair that disadvantage. You're calling Detective Arteaga. What are you going to get from him on that topic?

[Counsel]: I'm sorry. Can we start off with the gang officer again?

Court: No, you're finished with the gang officer.

[Counsel]: Okay. I would argue how many assaults do we have by this gang? How many assaults are with weapons? What types of weapons do they use? How many times do they use knives? How many times they use billy clubs, guns, et cetera.

Court: With your theory being that the jury would end up hearing statistical rate of occurrence that makes it less probable that your client would know or anticipate this?

[Counsel]: Yes. Because it's natural and probable consequences of the gun and the gun for the assault. So we would have to first go to the number of guns as opposed to other things used. He says machete. But I would want

to go into other things.  Actually it was the gang officer who said machete, I apologize.  And then go forward from there, yes.

Court:  All right.  It seems to me that, again, that's rather thin and questionable whether under 352 I would allow it.  Since the question is what did the defendant know of this occasion, with this person, not what would be the odds of two men meeting in a park, perceiving that a rival or an enemy was there, were going to engage in some violence against him. I doubt the gang officer, or Detective Arteaga would answer that in any way that would help the defendant."

The trial court denied defense counsel's request to call back the officer witnesses. The trial court proceeded to consider two primary questions before deciding to instruct the jury on the natural and probable consequences doctrine - sufficiency of the evidence, and fairness to the defendant.  The trial court found sufficient evidence supported the instruction.

On the question of fairness to the defendant, the trial court gave defendant an opportunity to testify.  In response, defense counsel argued changing the theory of liability at the deliberation stage of the trial put the defendant at a disadvantage since he had made a decision not to testify based on the evidence and theory as submitted to the jury.  The trial court reasoned, "it's not as if he's presented a defense to the jury through his own testimony and now he's coming back and having to revise his testimony.  He's got a blank slate if he chooses to testify.  And he has the same protections if he chooses not to testify.  All the jury has heard is pretrial statements from you."  The defendant decided not to testify.

The trial court decided to instruct the jury on the natural and probable consequences doctrine.  Ultimately, the trial court gave CALCRIM No. 400 (Aiding and Abetting: General Principles), 401 (Aiding and Abetting: Intended Crime), 403 (Natural and Probable Consequences - Only Non-Target Offense Charged), and 915 (Simple Assault).

8

## I. Sufficiency of Evidence to Support Denial of Motion for Acquittal under Section 1118.1

Defendant contends the trial court erred when it denied his motion for acquittal under section 1118.1 at the close of the prosecution's case-in-chief. We disagree.

When ruling on a section 1118.1 motion, the trial court determines whether substantial evidence supports each element of the charged offense, as it stood, at the time the motion is made. (*People v. Cole* (2004) 33 Cal.4th 1158, 1212-1213.) "A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question. Once such evidence is found, the substantial evidence test is satisfied. [Citation.]" (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.)

We review "independently a trial court's ruling under section 1118.1 that the evidence is sufficient to support a conviction." (*People v. Trevino* (1985) 39 Cal.3d 667, 695.) When circumstantial evidence is involved, "[w]e 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.)

### A. Laws On Murder and Aiding and Abetting

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be either express or implied. Express malice is the intent unlawfully to kill. (§ 188, subd. (a).) Implied malice is when a "killing show[s] an

9

abandoned and malignant heart." (§ 188, subd. (a).) According to *People v. Thomas* (1953) 41 Cal.2d 470, 480, malice is implied when "the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death." (*Id.* at p. 480.) *People v. Phillips* (1966) 64 Cal.2d 574, gives a slightly different definition. There, malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*Id.* at p. 587.)

Criminal liability through aiding and abetting is included in the definition of "principals" as set forth in section 31. It provides in pertinent part: "All persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals in any crime so committed." (§ 31.)

Under California law, aiding and abetting, like conspiracy, is considered a theory of vicarious liability. "The critical element which must be found to establish vicarious liability for the targeted offense is the aider and abettor's intent to facilitate and encourage that offense." (*People v. Jones* (1989) 207 Cal.App.3d 1090, 1096.)

When relying on aiding and abetting as a theory of vicarious liability, the People must prove beyond a reasonable doubt that "an aider and abettor act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. [Citations.]" (*People v. Beeman* (1984) 35 Cal.3d 547, 560.) "When the definition of the offense includes the intent to do some act or achieve some consequence beyond the *actus reus* of the crime [citation], the aider and abettor must share the specific intent of the perpetrator. By 'share' we mean neither that the aider and abettor must be prepared to commit the offense by his or her own act should the perpetrator fail to do so, nor that the aider and abettor must seek to share the fruits of the crime. [Citation.] Rather, an aider and abettor

10

will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime. [Citations.]" (*Ibid.*)

Elements of direct aiding and abetting are satisfied when the People prove the aider and abettor "[knew] the perpetrator's unlawful purpose and he or she specifically [intended] to, and [did] in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."[3]

## B. Analysis

Defendant contends the evidence at the close of prosecution's case-in-chief was insufficient to show defendant shared Gamez's intent to kill Davian. Defendant constructs the foundation of his argument on three bases: (1) that no evidence supports the conclusion he knew Gamez was armed with a firearm; (2) that no evidence supports the conclusion he actually "looked out" for Gamez, and (3) that no evidence confirms Davian was a rival gang member or that defendant knew Davian was an 18th Street gang member before the shooting.

The prosecutor primarily relied on circumstantial evidence to prove the case. "Mental state and intent are rarely susceptible of direct proof and must therefore be proven circumstantially. [Citations.] Consequently, a defendant's actions leading up to the crime may be relevant to prove his or her mental state and intentions at the time of the crime. [Citations.]" (*People v. Thomas* (2011) 52 Cal.4th 336, 355.)

---

[3] Elements on aiding abetting as given in CALCRIM No. 401 provide: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: 1. The perpetrator committed the crime; 2. The defendant knew that the perpetrator intended to commit the crime; 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

11

CALCRIM No. 224 on circumstantial evidence provides, in pertinent part, one "must accept only reasonable conclusions and reject any that are unreasonable." (CALCRIM No. 224.) *People v. Holt* (1997) 15 Cal.4th 619, instructs "[a]n inference is not reasonable if it is based only on speculation. [Citation.]" (*Id.* at p. 669.) In the instant case, the pertinent question is whether reasonable inferences, as opposed to speculation, support a finding defendant directly aided and abetted Gamez in the murder.

The prosecutor relied heavily on defendant's statements to Officer Arona in lock-up and to the homicide detectives in the formal interview to prove the case. In assessing these various statements, it is appropriate to evaluate the value and weight of these statements by taking into consideration the defendant's interests, bias and motives when they were made.[4]

At face value, defendant did not state: (1) that he knew Gamez was armed with a firearm before the shooting, (2) that he actually looked out for Gamez when requested, and (3) that he knew before the shooting that Davian was an enemy from the 18th Street gang.

However, when viewed in the light of his interests, bias and motive at the time the statements were made, negative inferences emerge. In his lock-up conversation with Officer Arona, defendant knew he had been arrested by the LAPD for a shooting that resulted in Davian's death. He made statements, such as identifying Davian as a "chavala" and describing the weapon as a .357, that show he may have been more than a bystander. Although defendant did not fully admit to participating in the murder, this is not surprising as Officer Arona, though feigning to be a fellow gang member, was a complete stranger. It is obvious, defendant did not know to what extent he could trust Arona.

---

[4] While defendant's statements were not testimony under oath, it is helpful for fact finders to consider the truth and accuracy of defendant's statements including attitude, bias, interest, motives or personal relationships by referring, for example, to the list of factors under CALCRIM No. 226 for assessing witness credibility.

In the interview with the detectives, the record reveals defendant started out by being untruthful. He minimized his involvement. Defendant acted as if he was a witness instead of a participant by telling the detectives he observed two people shoot someone. He knew, however, the detectives had a video of the incident. Defendant had not seen the video. He could not have known what the video depicted. On the other hand, he knew the video showed what happened as the detectives made reference to Gamez and defendant's movements that were consistent with what they had done. Defendant was verbally pushed to tell the truth and was constantly reminded of the video. In this interrogation setting, it is not unreasonable to conclude defendant revealed just enough to keep the pressure off while minimizing his role and denying full participation.

With a motive to minimize his role, defendant told the detectives he was sent by Guacal, a person defendant explained was an older MS gang member, along with Gamez to the park. While he indicated Guacal told them to go and pick something up, intimating the errand may have been drug related, defendant also stated Guacal told Gamez that "he" was there, indicating Gamez was being sent to the park to either meet up with, or, confront someone. From any angle, defendant's statement as to why Guacal had assigned Gamez and defendant to go to the park lacks clarity – the hallmark for the ring of truth. A plausible explanation for this uncertainty is defendant was not truthful and was minimizing. If so, it is reasonable to infer Guacol said more. And, based on the action Gamez took, that more may have been to kill a rival at the park.

Additional evidence circumstantially supports this inference. First, defendant and Gamez appear to be friends or close associates. This is established by the testimony of Officer Knight who, in a month or so, made three random contacts with defendant who was always with Gamez. From this, it is reasonable to conclude if Knight saw them together on three random occasions, the two must associate with one another more frequently. Second, defendant and Gamez are members of MS, Park View clique. This is established through the testimony of Officer Placencia as well as Officer Arona and Knight. It is reasonable to conclude, as friends or close associates who are also fellow gang members, the two have an interest in working together to enhance their respective

13

reputations both in the gang and with their rivals. Third, MacArthur Park is located within the claimed territory of MS Park View clique adjacent to the territory of their rival, the 18th Street gang. It is reasonable to infer MS gang members, including Gamez and defendant, would be expected to protect their turf from rivals through violence. Fourth, MS gang members commit crimes in order to enhance their reputation both within the gang as well as with their rivals. This is supported by the gang expert's testimony.

There is no dispute Gamez killed Davian. The record also establishes defendant was with Gamez when Davian was killed. Analyzing Gamez's actions is appropriate to assess defendant's involvement. Either Gamez acted alone or he and defendant worked together. Is it reasonable to conclude Gamez would keep his murderous intent a secret from defendant who appears to be a gang friend or close associate who alone was his potential back-up? On the other hand, is it consistent with basic human behavior that Gamez who was intent on taking the life of a person thought to be a rival, exposing himself to danger of arrest or retaliatory violence from a rival gang, would share that plan with defendant? While Gamez could have been a rogue criminal, it is just as plausible, perhaps even more logical that Gamez would have shared his plan with defendant and that they worked together. The latter is a reasonable inference based on the evidence adduced at trial.

When we arrive at a logical and reasonable inference, we are at the end of our review. We hold substantial evidence supports the trial court's denial of the section 1118.1 motion.

## II.     Sufficiency of Evidence to Support the Verdict

Defendant next contends insufficient evidence supports his conviction of second degree murder under the natural and probable consequences doctrine. We disagree.

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a

14

reasonable doubt.  [Citation.]  The federal standard of review is to the same effect:
Under principles of federal due process, review for sufficiency of evidence entails not the
determination whether the reviewing court itself believes the evidence at trial establishes
guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the
light most favorable to the prosecution, any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.  [Citation.]  The standard of
review is the same in cases in which the prosecution relies mainly on circumstantial
evidence.  [Citation.]  ' "Although it is the duty of the jury to acquit a defendant if it finds
that circumstantial evidence is susceptible of two interpretations, one of which suggests
guilt and the other innocence [citations], it is the jury, not the appellate court[,] which
must be convinced of the defendant's guilt beyond a reasonable doubt.  ' "If the
circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing
court that the circumstances might also reasonably be reconciled with a contrary finding
does not warrant a reversal of the judgment." '  [Citations.]" '  [Citation.]"  (*People v.
Rodriguez* (1999) 20 Cal.4th 1, 11.)

### A.  Natural and Probable Consequence Doctrine

An aider and abettor is not only guilty of the crime originally intended, but of any
crime actually committed so long as the commission of that crime was reasonably
foreseeable.  Under the natural and probable consequence doctrine, the " 'question is not
whether the aider and abettor *actually* foresaw the additional crime, but whether, judged
objectively, it was *reasonably* foreseeable.  [Citations.]' "  (*People v. Medina* (2009)
46 Cal.4th 913, 920 (*Medina*).)  A reasonably foreseeable consequence is to be evaluated
under all the factual circumstances of the individual case and is a factual issue to be
resolved by the jury.  (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1376; *People v.
Godinez* (1992) 2 Cal.App.4th 492, 499.)

**B. Analysis**

The defendant contends the facts adduced at trial "was not the typical gang encounter where there was evidence that two or more gang members mutually decided to approach an individual or a rival gang member and assault them, while calling out some gang challenge or engaging in mutual combat." We disagree.

The factual analysis under section I.B applies with equal force in analyzing the sufficiency of the evidence to support the murder conviction based on the natural and probable consequences doctrine. Defendant's statements, like a coin, has two sides -- what was said and what was left unsaid. If a person decides to lie, or to tell half-truths, radically different inferences emerge. The record reveals defendant was not entirely truthful.

As explained earlier, the negative inferences derived from defendant's statements in combination with logical inferences from the gang evidence establishes a reasonable conclusion Guacal had sent defendant and Gamez on a violent mission to the park. Based on Gamez's subsequent action, it is not unreasonable to conclude the mission was to kill a rival. On the other hand, as a step down from this conclusion, it is also plausible defendant and Gamez went to the park to assault a rival who had encroached in their territory.

During the trial, Officer Placencia testified concerning the gang's view of protecting their reputation in their territory:

"A gang is -- usually has its territory within a couple blocks or little section within -- I'll refer to L.A. city. That's their territory. And they demand respect. They demand respect not only from other gang members, but respect from the community. The tagging on the wall, that's a sign, like a newspaper. They want the respect. They want the neighborhood to know this is their hood. This is their territory. By doing that they intimidate the community. And respect is pretty much, probably for the hispanic gangs, for the gang itself, is the number 1 thing that gangs seek for."

16

Officer Placencia testified gangs gain respect by committing crimes ranging from low grade vandalism all the way up to murder. He further testified gang members commit crimes in open public to "[show] the community, and the other rival gang members, that they're not afraid to commit the crime."

In *Medina,* the California Supreme Court reversed a Court of Appeal which had found the evidence adduced at trial insufficient to support a murder conviction based on the natural and probable consequences doctrine. (*Medina, supra*, 47 Cal.4th at pp. 921-922.) The Court of Appeal identified six relevant factors from prior positive cases on the natural and probable consequences doctrine.[5]

The *Medina* court wrote, "[i]n evaluating this case, the Court of Appeal found it significant that none of the above factors were present, focusing on facts that were *missing,* rather than on the actual evidence presented. [Citation.] However, as the Attorney General points out, prior knowledge that a fellow gang member is armed is not necessary to support a defendant's murder conviction as an aider and abettor. [Citations.] Likewise, prior gang rivalry, while reflecting motive, is not necessary for a court to uphold a gang member's murder conviction under an aiding and abetting theory. [Citation.] Thus, although evidence of the existence of the above listed factors may constitute sufficient evidence to support an aider and abettor's murder conviction under the natural and probable consequence theory, these factors are not necessary to support such a conviction. [Citation.] We do not view the existence of those factors as an exhaustive list that would exclude all other types and combinations of evidence that could support a jury's finding of a foreseeable consequence. [Citation.] In other words, the absence of these factors alone is not dispositive." (*Medina, supra,* at pp. 921-922.)

---

[5] The six factors are: " '(1) the defendant had knowledge of the weapon that was used before or during his involvement in the target crime; (2) the committed crime took place while the target crime was being perpetrated; (3) weapons were introduced to the target crime shortly after it ensued; (4) the fight which led to the committed crime was planned; (5) the gangs were engaged in an ongoing rivalry involving past acts of violence; or (6) the defendant agreed to or aided the commission of the committed crime.' " (*Medina, supra,* 46 Cal.4th at p. 921.)

17

In examining the whole record in the light most favorable to the prosecution, based on the combinations of evidence presented to the jury in this case, we conclude a rational trier of fact could have found Davian's killing was a reasonably foreseeable consequence of the gang assault.

First, as the gang expert testified, gang members protect their territory by resorting to violence to enhance their reputation. The record establishes MacArthur Park was within the territory claimed by the MS Park View clique. It is not unreasonable to conclude members from the MS Park View clique would resort to murder to protect their territory, including the park.

Second, the record reveals MS is a growing violent gang which commits violent crimes such as assault with a deadly weapon and murder. Law enforcement identified Gamez and defendant as members of the MS Park View clique and the two had been identified together on multiple occasions. It is reasonable to conclude those who join a notoriously violent gang have themselves the capacity to commit crimes of violence.

Third, expert testimony establishes MS Park View clique and 18th Street are rivals and share a common border along MacArthur Park. Officer Arona testified the defendant identified the person killed as a "chavala" which refers to an enemy including gang members from the 18th Street. It is reasonable to conclude an assault on a rival could quickly turn deadly.

Fourth, the assault and the murder were not interrupted and separate events but instead occurred in the flow of one transactional event. Indeed, the assault and the killing were consecutive events that happened as one continuous action. In other words, there were no intervening events between the assault and the murder affecting the chain of causation.

Fifth, the negative inferences from defendant's statements to Officer Arona and the homicide detectives together with the video showing the two together at the time of the shooting support a reasonable conclusion defendant and Gamez were on a mission to do violence.

18

On the record before us, we are convinced a rational jury could conclude the killing was a reasonably foreseeable consequence of helping Gamez commit a gang assault. We hold substantial evidence supports the jury's guilty verdict of second degree murder under the natural and probable consequences doctrine.

## III. Trial Court's Decision to Instruct on Natural and Probable Consequences Doctrine and Denial of Request to Recall Officer Witnesses

The defendant's last two contentions – whether the trial court violated his Sixth and Fourteenth Amendment rights,[6] when it instructed the jury on the natural and probable consequences doctrine during jury deliberations and when it denied defendant's request to recall two officer witnesses – requires that we answer a total of four questions.

First, defendant's contention challenging the trial court's decision to instruct on the natural and probable consequences doctrine during jury deliberations contains three sub-parts (1) the constitutional adequacy of the notice concerning the theory of liability; (2) whether substantial evidence supported the trial court's decision to instruct; and (3) whether the trial court abused its discretion in giving the instruction to a deliberating jury. Defendant's other contention concerning the trial court's denial of his request to recall officer witnesses triggers an abuse of discretion analysis on the trial court's decision.

### A. Decision to Instruct

In the instant case, the trial court was presented with a jury question during deliberation. On the second day of deliberations, the jury asked a series of questions culminating with Question 4 which inquired, "[p]lease clarify Instruction 401, item 2: Is this specific to the crime of murder (The crime) or does it apply to A crime (any intended crime) that may lead to murder." CALCRIM No. 401, item 2 states, "[t]he defendant knew that the perpetrator intended to commit the crime[.]" Under direct aiding and abetting, the crime referred to in CALCRIM element 2 is the crime of murder. If on

---

[6] The specific constitutional rights defendant asserted were his rights to due process, to a fair trial, to counsel, to confrontation and to present a defense.

19

the other hand, that crime may be any intended crime "that may lead to murder," this suggested the application of the natural and probable consequences doctrine.

It is fair to say, based on the lengthy discussions on the record that occurred thereafter, both sides as well as the trial court, were taken by surprise. Thereafter, the trial court (1) considered defendant's request to call back two officer witnesses which it denied; (2) offered defendant the opportunity to testify which the defendant declined; (3) gave the prosecutor and defense counsel an opportunity to argue the natural and probable consequences doctrine to the jury which both did; and (4) answered the jury's question by re-reading some instructions and giving additional instructions on the natural and probable consequences doctrine.

### B. Adequacy of Notice

Defendant argues "the prosecutor was allowed to ambush the defense with a new crime, albeit a target crime, and an alternate theory of the crime, after the evidence was submitted." Relying on *Sheppard v. Rees* (1990) 909 F.2d 1234 (*Sheppard*), and *People v. Marzett* (1985) 174 Cal.App.3d 610, defendant contends he was denied constitutionally adequate notice of the new theory of liability which deprived him of his right to effective representation of counsel.

Resolving defendant's claim on the adequacy of notice involves questions of constitutional law and mixed questions that are predominantly legal. As such, we review this contention de novo. (*People v. Quiroz* (2013) 215 Cal.App.4th 65, 70 (*Quiroz*).) Our review of the record reveals defendant's contention lacks merit.

Under California's short-form pleading practice, a prosecutor who charges a defendant as a principal is deemed to also have charged him as an aider and abettor. (§ 971.) "[I]n California the definition of a principal has historically included those who aid and abet (§ 971), and notice as a principal is sufficient to support a conviction as an aider or abettor." (*People v. Garrison* (1989) 47 Cal.3d 746, 776, fn. 12.) In other words, a defendant may be convicted of aiding and abetting without the charging document specifically reciting the aiding and abetting theory so long as he or she is charged as a principal to the substantive offense. (*Ibid.*) Criminal liability under aiding

20

and abetting may be established directly or through the natural and probable consequences doctrine.

A criminal defendant also has a right to be informed of the charges under the federal constitution. (*Quiroz, supra,* 215 Cal.App.4th at p. 70.) Whether the short-form pleading practice in California is constitutionally adequate is unsettled. (*Ibid*.) Notice is adequate if the factual basis of the theory was presented at the preliminary hearing. (See *People v. Roberts* (1953) 40 Cal.2d 483, 486 ["[T]he evidence adduced at the preliminary hearing will adequately inform the defendant of the prosecution's theory regarding the manner and degree of killing."]) It is also satisfied "by the People's express mention of that theory before or during trial sufficiently in advance of closing argument. [Citations.]" (*Quiroz, supra,* 215 Cal.App.4th at pp. 70-71.)

Defendant concedes "under California's practice of short-form pleading, an instrument charging a defendant as a principal is deemed to charge him as an aider and abettor as well." Defendant's contention rests primarily on *Sheppard*, a case where the Ninth Circuit reversed a state murder conviction on a habeas petition based on a prosecutor's end of trial request for an instruction on an unexpected theory of liability which, in the court's view, "ambushed" the petitioner. (*Sheppard, supra,* 909 F.2d at p. 1236.)

In *Sheppard*, the petitioner was charged with murder and tried on a theory of first degree murder which was willful, deliberate and premeditated. After all the evidence was presented and jury instructions argued and settled with the trial court, the prosecutor came up with a new theory of first degree murder under the felony-murder rule. The trial court granted the prosecutor's request and gave the felony-murder instruction. The petitioner was convicted of first degree murder.

In finding error, the *Sheppard* Court noted, "the prosecutor 'ambushed' the defense with a new theory of culpability after the evidence was already in, after both sides had rested, and after the jury instructions were settled. This new theory then appeared in the form of unexpected jury instructions permitting the jury to convict on a

theory that was neither subject to adversarial testing, nor defined in advance of the proceeding." (*Sheppard, supra*, 909 F.2d at p. 1237.)

*Quiroz* cites *Sheppard* and explains, "[w]hat due process will not tolerate is the People affirmatively misleading or ambushing the defense with their theory. [Citations.]" (*Quiroz, supra*, 215 Cal.App.4th at p. 71.) On *Sheppard's* continuing reach and vitality, "California and Ninth Circuit decisions have uniformly viewed *Sheppard* narrowly and limited it to its facts." (*People v. Lucas* (1997) 55 Cal.App.4th 721, 738.) After *Sheppard*, the Ninth Circuit has held no 'ambush' occurs if felony-murder instructions are mentioned for the first time at an initial instructions conference, so long as trial evidence supports the theory and the defense has a day or more to prepare oral argument. (See *Morrison v. Estelle* (1992) 981 F.2d 425, 428 ["At [defendant's] trial, the prosecutor requested felony-murder instructions at the initial instructions conference and [defendant's] counsel had two days in which to prepare a closing argument. No ambush occurred at [defendant's] trial"])

Finally, "[w]hile federal circuit court precedent on issues of federal law is certainly entitled to substantial deference, it is not binding. [Citations.]" (*Yee v. City of Escondido* (1990) 224 Cal.App.3d 1349, 1351.)

Defendant claim he was "ambushed" by the prosecutor. However, the record on appeal reveals otherwise. The triggering event which led to the instruction on the natural and probable consequences doctrine did not originate with the prosecutor but was raised by the jury. While it is true, the prosecutor requested the trial court to instruct on the natural and probable consequences doctrine in response to the jury question, that request is distinctly different from the conduct of the prosecutor in *Sheppard* who alone came up with the idea at the conclusion of the trial. Unlike *Sheppard*, the prosecutor's request here was not the result of prosecutorial gamesmanship. The prosecutor in no way affirmatively misled the defendant.

Furthermore, nothing suggests the evidence supporting the natural and probable consequences doctrine was any different from that presented at the preliminary hearing. While the divisibility of Gamez's criminal act (shooting Davian as a combination of

22

simple assault and murder) and the reasonable inference of defendant's mental state supporting that theory (that he aided and abetted a simple assault derived from defendant's statements to the police) may not have been readily apparent to either counsel, nevertheless, no new evidence from that originally charged was introduced. The evidence, susceptible to this theory was provided to the defense well in advance of the trial providing sufficient notice. Finally, when Question 4 was raised by the jury, defense counsel had approximately a day to prepare and consider how to defend against the doctrine, including the possibility of re-opening evidence and formulating an argument against the application of the doctrine. The circumstances here are not analogous to *Sheppard*. We hold defendant was not deprived constitutionally adequate notice. Accordingly, his deprivation of counsel claim also fails.

### C. Whether Substantial Evidence Supported the Natural and Probable Consequences Instruction

We review de novo a trial court's decision either to instruct or refuse to instruct. "Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact that[.]. . is . . . predominantly legal. As such, it should be examined without deference." (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

On when to instruct on the natural and probable consequences doctrine, *People v. Prettyman* (1996) 14 Cal.4th 248, explains "[t]he trial court should grant a prosecutor's request that the jury be instructed on the 'natural and probable consequences' rule only when (1) the record contains substantial evidence that the defendant intended to encourage or assist a confederate in committing a target offense, and (2) the jury could reasonably find that the crime actually committed by the defendant's confederate was a 'natural and probable consequence' of the specifically contemplated target offense. If this test is not satisfied, the instruction should not be given, even if specifically requested." (*Id.* at p. 269.) "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8)

Defendant's statements to homicide detectives are reasonably susceptible to logical negative inferences supporting the natural and probable consequences doctrine. As a prime suspect in Davian's murder, defendant had a motive to lie, or, to minimize his involvement. While defendant never stated he and Gamez were sent by Guacal to assault or kill Davian, he admitted both were sent by Guacal, an older gang MS Park View gang member, to the park to pick up, possibly, some drugs. If, however, defendant minimized his involvement, it is not unreasonable to conclude, defendant and Gamez were sent on a mission to assault a rival.

The gang evidence adduced further supports the natural and probable consequences doctrine. Officer Placencia, the gang expert, testified the MS gang is a violent gang boasting membership of approximately 40,000. MacArthur Park is located in a territory claimed by the MS Park View clique, a gang to which defendant belongs. Defendant identified Davian to Officer Arona as a "chavala" a term referring to a potential rival from the 18th Street gang. Officer Placencia testified gang members protect their territory in order to enhance their reputation and gain control.

Our independent review of the record reveals substantial evidence supported the trial court's decision to instruct the jury on the natural and probable consequences doctrine.

**D. Whether Trial Court Abused Its Discretion by Instructing a Deliberating Jury**

The trial court gave the natural and probable consequences doctrine in response to a jury question posed during deliberations. "An appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury. [Citations.]" (*People v. Waidla, supra*, 22 Cal.4th at pp. 745-746.)

"Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.)

Section 1093 provides a general order of trials. Instructing the jury should follow the close of evidence and arguments of counsel. (§ 1093, subds. (e) & (f).) Upon good cause, section 1094 authorizes a trial court to depart from the sequential order set forth in section 1093. Regarding the timing on instructing a jury, trial courts are vested with wide discretion on when to do so. (*People v. Smith* (2008) 168 Cal.App.4th 7, 14.)

The Attorney General relies on *People v. Ardoin* (2011) 196 Cal.App.4th 102 (*Ardoin*), and argues the trial court's decision to instruct was supported by substantial evidence and was properly given to assist the jury under section 1138.[7]

Under section 1138, a trial court has a duty to "to provide the jury with information the jury desires on a point of law." (*People v. Smithey* (1999) 20 Cal.4th 936, 985, fn. omitted.) This does not mean every question asked must necessarily be answered. Instead, the trial court is vested with discretion under section 1138 "to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.]" (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

*Ardoin* involved a joint murder prosecution of two defendants. Appellant was prosecuted under first degree malice aforethought as the direct perpetrator of the murder. The co-defendant was tried under aiding-and-abetting and felony murder theories. (*Ardoin, supra*, 196 Cal.App.4th at p. 123.) The jury was instructed accordingly. During deliberations, the jury asked whether the appellant, if found not to be the perpetrator, could still be found guilty of felony murder. (*Id.* at p. 124.) The trial court ultimately amended the felony murder instruction to include the appellant. Thereafter, appellant was convicted of first degree murder.

---

[7]     Section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

In his appeal, appellant there cited *Sheppard* and argued "the trial court deprived him of the rights to effective assistance of counsel and due process by instructing the jury 'on a new theory of liability after the start of deliberations[.]' " (*Id.* at pp. 125-126.)

In denying appellant's contention, the *Ardoin* court, among other reasons, explained, "[a]lthough the prosecution pursued what it viewed as the strongest case against [appellant] by arguing that he was the actual killer, the evidence presented at trial also suggested the jury might find him guilty under the felony-murder rule as a perpetrator of the robbery and aider and abettor of the crime committed by another. Despite the focus of the prosecution and defense theories of the case, the court properly modified the felony-murder instruction in accordance with the evidence presented by including a reference to both defendants. [Citations.] '[T]he court is not *precluded* from giving any instruction for which there is evidentiary support. The fact that a party did not pursue a particular theory does not preclude the trial judge from giving an instruction on that theory where it deems such an instruction to be appropriate.' [Citation.]" (*Ardoin, supra,* at p. 128.)

Here, when the jury asked Question 4, the trial court was under an obligation to assist the jury under section 1138. As we concluded earlier, substantial evidence supported the instruction on the natural and probable consequences doctrine. That the prosecutor at first focused on direct aiding and abetting, although certainly a factor to consider, did not, as explained in *Ardoin*, preclude the trial court from instructing on the natural and probable consequences doctrine.

In the instant case, we find no abuse of discretion. When each step of the trial court's various decisions are considered, a well reasoned sequential approach emerges. First, the trial court determined whether substantial evidence supported instructing on the natural and probable consequences doctrine. Second, it considered the stage of the trial and fairness concerns raised by the defendant. The trial court gave defendant an opportunity to testify and permitting counsel to re-argue the case. Only after considering each of these steps did the trial court finally give the instructions on the natural and

probable consequences doctrine to the jury.  Based on this record, we cannot say the trial court actions were arbitrary and capricious.

### E.  Denial of Defendant's Request to Recall LAPD Witnesses

Defendant finally argues the trial court's denial of his request to call back Officer Placencia and Detective Arteaga for additional questioning was arbitrary as having "pre-judged what the gang expert or Arteaga were going to say and assume that the jury would take nothing from their re-opened testimony."  He argues the trial court's error violated his federal constitutional rights to confrontation and to present a defense.  Contrarily, the Attorney General argues "[t]he trial court was well within its discretion in denying defense counsel's request to call back Officer Placencia, the gang expert, and Detective Arteaga, the investigating officer, because such reopened testimony plainly lacked relevance."

Evidence Code section 778, authorizes the trial court to call back witnesses who have testified.  It provides, "[a]fter a witness has been excused from giving further testimony in the action, he cannot be recalled without leave of the court.  Leave may be granted or withheld in the court's discretion."  The decision to recall witnesses is left to the sound discretion of the trial court.  (*People v. Keith* (1875) 50 Cal. 137, 140, *People v. Thomas* (1992) 2 Cal.4th 489, 542.)

On defendant's claim of federal constitutional error, " '[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.' "  (*People v. Hawthorne* (1992) 4 Cal.4th 43, 58.)  Furthermore, despite "the confrontation clause, a trial court may restrict cross-examination of an adverse witness on the grounds stated in Evidence Code section 352."  (*People v. Quartermain* (1997) 16 Cal.4th 600, 623.)

In the instant case, defense counsel's offer of proof focused on statistical probabilities on the occurrence rate of murders that result from assaultive crimes committed by the MS gang members.  The trial court responded, "[i]t seems to me that, again, that's rather thin and questionable whether under 352 I would allow it.  Since the question is what did the defendant know on this occasion, with this person, not what

27

would be the odds of two men meeting in a park, perceiving that a rival or an enemy was there, were going to engage in some violence against him. I doubt the gang officer, or Detective Arteaga, would answer that in any way that would help the defendant."

" '[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing function under Evidence Code section 352.' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1285.)

The trial court did not abuse its discretion in finding defendant's proposed line of questions inadmissible under Evidence Code section 352. The trial court implicitly found defense counsel's offer of proof speculative and minimally relevant. The pertinent question is what a reasonable person in *defendant's position* would have known under the circumstances of aiding and abetting the target crime.[8] General statistical probabilities on the occurrence rate of murders that result from assaultive crimes committed by the MS gang members is only minimally relevant to shed light on that subject. Indeed, a single incident, given the circumstances, could lead to a conclusion of reasonable foreseeability. As such, defendant's offer of proof was over-broad, speculative and lacking in probative value.

Assuming the trial court erred, the error was harmless. The defendant's right of confrontation is not absolute. (*Curry v. Superior Court* (1970) 2 Cal.3d 707, 715.) The trial court's reliance on Evidence Code section 352 to exclude evidence "generally does not contravene a defendant's constitutional rights to confrontation and cross-examination. [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 545.)

"Although defendant attempts to frame the issue as one of federal constitutional dimension, this is not correct. 'As a general matter, the "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a

---

[8]     Element 3 of CALCRIM No. 403 given to the jury stated, "[u]nder all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the simple assault."

28

defense." [Citations.] . . . Accordingly, the proper standard of review is that announced in [*People v. Watson* (1956) 46 Cal.2nd 818 (*Watson*)] and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension. [Citations.] Application of Evidence Code section 352 is within this principle. [Citation.]" (*People v. Paniagua* (2012) 209 Cal.App.4th 499, 524.) Under the *Watson* test, we ask whether it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (*Watson, supra,* 46 Cal.2d at p. 837.)

"The determination whether a particular criminal act was a natural and probable consequence of another criminal act aided and abetted by a defendant requires application of an objective rather than subjective test. [Citations.] This does not mean that the issue is to be considered in the abstract as a question of law. [Citation.] Rather, the issue is a factual question to be resolved by the jury in light of all of the circumstances surrounding the incident. [Citations.] Consequently, the issue does not turn on the defendant's subjective state of mind, but depends upon whether, under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant. [Citations.]" (*People v. Ngyuen* (1993) 21 Cal.App.4th 518, 531.)

In the instant case, the critical factual focus, as explained in *Nguyen*, is on the incident itself -- Gamez's shooting of Davian, to determine, by looking at all of the circumstances surrounding the shooting, whether a person in defendant's position would have or should have known murder was a reasonably foreseeable consequence of the assault.

Defendant's proposed line of questioning would tend to establish the general statistical probabilities on the occurrence rate of murders that result from assaultive crimes committed by the MS gang members. We observe a few problems. First, we do not know what Officer Placencia or Detective Arteaga would have ultimately said in testimony. As such, the analysis rests in large measure on conjecture and speculation. Second, even if the witnesses would have testified that not all assaults committed by MS

29

gang members result in a murder, such testimony does not take into account the specific facts about how those assaults may have occurred. Such testimony has little to no comparative value to Davian's shooting in the park. Third, it seems likely no expert testimony is required to argue that not all assaults result in a murder. This conclusion was already established through the gang expert's testimony that MS gang members commit crimes of violence such as robberies and assault with deadly weapons - meaning, these crimes did not result in homicides. The proposed testimony is far too weak and speculative to have any meaningful impact on the outcome of the trial. As such, it is not reasonably probable defendant would have obtained a more favorable result but for the alleged error.

We hold the trial court did not abuse its discretion in denying defendant's request to recall Officer Placencia and Detective Arteaga. Consequently, we necessarily deny defendant's constitutional claims.

## DISPOSITION

The judgment is affirmed.


OHTA, J.*

We concur:


RUBIN, ACTING P. J.


GRIMES, J.

---

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# PEOPLE v. LUIS GUTIERREZ – B259135

J. RUBIN, Concurring:

I concur in the decision of the court but write separately to comment on the events that occurred after the jury began its deliberations. To say that the question asked by the jury, which focused court and counsel on the previously unarticulated natural and probable consequences theory, was jaw dropping is perhaps an understatement. Jaw unhinging may be more appropriate.

In response to the jury's dynamite question, the court understandably treaded carefully, balancing the prosecutor's right to pursue a theory that was supported by the evidence and defendant's right to a fair trial and to not have fundamental assumptions about the case erased at the last minute. The Reporter's Transcript reveals a trial court that diligently tried to achieve a reasonable medium. And I agree with the majority that it correctly responded to the jury's question with instructions on the natural and probable consequences doctrine.

A much closer question in my mind was the court's statement that it would not allow the defense to recall police officer witnesses to explain the circumstances in which a gang assault might lead to a gang murder. Ultimately, I conclude that, on this record, the trial court did not abuse its discretion. I observe, however, that courts allow gang experts to opine on all sorts of facts related to gang life and gang crime. Defendant's proposed foray did not seem to be too far afield. The majority points out that we do not know what the gang officers would have said but of course defense counsel had had no time to talk to the gang officers about what the police witnesses might testify on the subject. Which brings me to the point that bothers me the most about the way this case concluded. Why the rush? There is no doubt the defense was severely damaged by the juror's question. The court even offered to declare a mistrial if the parties had stipulated. The record at least implicitly indicates neither party took the court up on the offer. There was then further discussion about whether the defendant, who had not testified, would

testify if the case were reopened.  The defense apparently concluded this would raise more questions than answer them.  Defendant did not testify.

Absent from the discussion among court and counsel was the subject of an adjournment of the trial for a few days to provide the defense with a reasonable opportunity to consider options, including conferring with the police officers – if they would have spoken to counsel – or consulting with potential defense experts on issues that legitimately arose when the theory of the case changed.  As thoughtful as the court was in considering a variety of options, this was apparently not one of them. I put no particular blame on the court because defense counsel did not ask for a continuance so we do not know what the trial court would have done upon a proper request.  What the record does reveal is that, as court and counsel talked, the deliberating jury was waiting and there was considerable pressure to move forward in the efficient pursuit of a verdict. Perhaps this is one of those cases when efficiency should have taken a back seat to ensuring a just resolution.

RUBIN, J.